No. 33,926

CLIFFORD DUNSWORTH et al., *Appellees*, v. JAMES EDWARD DUNSWORTH et al. (*Defendants*), EARL M. CLEM et al., *Appellants*.

(81 P. 2d 9)

Opinion filed July 9, 1938.

*Roy C. Davis, Warren H. White, Frank S. Hodge, William H. Vernon, Jr.,* and *Eugene A. White,* all of Hutchinson, for the appellants.

*J. S. Simmons, Alva L. Fenn, Herbert E. Ramsey, Charles S. Fulton, C. E. Branine, H. R. Branine* and *Aaron Coleman,* all of Hutchinson, for the appellees.

The opinion of the court was delivered by

THIELE, J.: The question in this appeal is the effect of an antenuptial contract on a previously executed will.

In contemplation of marriage subsequently performed between them, Buckner W. Dunsworth and Lucy Meyers entered into an antenuptial contract dated April 4, 1929. Buckner W. Dunsworth had made a will dated November 10, 1902, which had never been revoked unless by the antenuptial contract, and on his death in June, 1936, it was duly admitted to probate. Lucy Meyers Dunsworth died in June, 1937, and her will, not here material, was admitted to probate.

Some of those persons who would have been heirs of B. W. Dunsworth filed their action against others of the same class and against the heirs of Lucy B. Dunsworth (same as Lucy Meyers Dunsworth) and the administrator with the will annexed of her estate, setting up the relationship of the parties, the will of B. W. Dunsworth, the antenuptial contract, and alleging that the contract revoked the will. They sought to have the probate of the will set aside and the property of B. W. Dunsworth partitioned among those persons who would have been heirs had he never married Lucy Meyers. The answer and cross petitions of those defendants who were children and grandchildren of B. W. Dunsworth prayed for like relief. The answer of those defendants who were heirs of Lucy B. Dunsworth contained a general denial, a general demurrer, and prayed generally that the will be decreed unrevoked and in full force, etc.

At the trial the facts were stipulated. Our summary is based on the stipulation. Some of the facts are stated above. On November 10, 1902, B. W. Dunsworth, in connection with a Masonic Lodge ceremony, made a will under which his estate was to be divided among his legal heirs according to the laws of Kansas. Lucy Meyers was married to B. W. Dunsworth on April 4, 1929, and was his fifth wife. His last previous wife had died in 1925. At the time of the last marriage he was 78 years old and his wife was 64. Both had children by previous marriages, and there was no issue of their marriage. Just prior to the marriage, they executed an antenuptial contract. At that time B. W. Dunsworth owned the property mentioned in the contract. Mrs. Dunsworth owned some real estate which she later lost as the result of a foreclosure. No property was thereafter acquired as the result of their joint efforts. The contract

contained three preliminary paragraphs stating the intended marriage, the desire of each party to provide for disposition of his or her separate property, and listed in detail the real estate owned by B. W. Dunsworth and that he had personal property of the aggregate value of $6,500 and that Mrs. Dunsworth had an undivided interest in some described real estate. After stating that each party was fully informed as to the property of the other, and with full knowledge of the rights of each under the laws of Kansas, the parties agreed that "each of them be and continue completely independent of the other as regards the enjoyment and disposal of his or her property owned by him or her at the commencement of the marriage" and that such property should remain his or her separate property, etc., "in the same manner as if the said proposed marriage had never been solemnized."

Another paragraph read as follows:

"And it is the intention of the parties hereto to mutually release and waive all the benefit of the laws of the state of Kansas, or any other state, relating to husband and wife, dower, homestead or other statutory provision as affects said property, and forever bar each other, respectively, from any action to recover any interest in the property of the other by reason of said marriage."

The parties further agreed with each other that upon the death of either, the other would not assert any claim, interest, estate or title under the laws of any state in and to the property of the deceased party and relinquished to the—

"Legatees, devisees, heirs, administrators, executors, trustees and assigns of such deceased party any and all of his or her claim, distributive share, interest, estate or title that he or she would be entitled to as a surviving husband or wife, respectively, except as hereinafter specified," etc.

and agreed to make all requisite deeds, etc., to make effective the agreements—

"And in case of separation or divorce, neither will assert or claim any right, title or interest in the property of the other owned at the date of said marriage."

Each party was given the right to sell and dispose of his or her property, the other agreeing to join in any conveyance, and "either party hereto shall have the right to dispose of, *by will,* any or all of his or her separate property owned by him or her at the time of the marriage, to *whomsoever he or she may desire,* and consent to the same is hereby expressly given by the other party hereto."

Following the above quotation is a statement that the instrument

is intended to reserve to each party all property owned by him or her separately and that neither shall have any right or interest in the property of the other nor in the income thereof, "except as hereinafter specified, nor shall the heirs of one party have any interest in said separate property of the other party." It is then stated that on account of their age, the parties do not expect to acquire any additional property, except income from presently owned property, but if any is acquired, it shall belong to both and each shall have an undivided one-half interest in the same. And finally, it was agreed that if the parties continued to live together as husband and wife until the death of B. W. Dunsworth, then and in that event Lucy should receive the sum of $1,000 in cash after his death; he agreed after the marriage to convey to her certain described real estate, and that there should be paid to her out of his estate the sum of $50 per month for the time they lived together as husband and wife. This contract was duly executed and acknowledged by the parties and it was also witnessed by two witnesses.

In November, 1931, the parties executed a document headed "Supplemental Contract," which recited execution of the contract of April 4, 1929, in which they had attempted to define and state their legal obligations to each other and that they had married, but that it was claimed by B. W. Dunsworth that a part of the contract was not according to their original agreement; that it was their desire to live together peaceably and carry out the intent of the contract and after consultation by B. W. Dunsworth with his attorney and Lucy Meyers Dunsworth with her attorney, and after careful consideration and full understanding by all parties, it was agreed the contract of April 4, 1929, be corrected and amended as follows:

"The fourth paragraph on the last page thereof being the paragraph providing for a sum of money calculated per-month to be paid to the said Lucy Meyers Dunsworth by the said Buckner W. Dunsworth shall be changed to read as follows:

" 'On the death of the said Buckner W. Dunsworth, if he shall die first there shall be paid unto the party of the second part out of the estate a sum of money equal to $25 per month for the time the parties live together as husband and wife, said sum to be paid as soon as convenient after the death of the party of the first part. If the said Lucy Meyers Dunsworth shall die before the said Buckner W. Dunsworth, then on her death said sum of $25 per month as specified above, shall be paid to her estate, it being understood, however, that the payment of the $1,000 mentioned above and the transfer of the property above described is contingent on the said Lucy Meyers Dunsworth outliving the said Buckner Dunsworth.'

"It is agreed and understood that each and every one of the other conditions and covenants of said agreement shall be and remain as they now are and this shall be an amendment to the same, only so far as specified herein."

This supplemental contract was duly executed and acknowledged and also bore the signature of two witnesses. It was stipulated that at the time the supplemental contract was executed, B. W. Dunsworth executed a deed to his wife for the real estate described in the original contract, and delivered it to the Citizens Bank in Hutchinson in an envelope, endorsed:

"This deed is to be delivered to Lucy Meyers Dunsworth on the death of Buckner W. Dunsworth. In case of the death of Lucy Meyers Dunsworth before that of Buckner W. Dunsworth, then the deed is to be delivered to Buckner W. Dunsworth. (Signed) B. W. DUNSWORTH. (Signed) LUCY MEYERS DUNSWORTH."

The Citizens Bank was closed and the deed was transferred to a successor bank, which is now in possession.

It was also stipulated that the various documents were duly executed, witnessed, etc., and that the will, antenuptial contract, supplemental contract and instructions for the delivery of the deed were not revoked, annulled or canceled during the lifetime of B. W. Dunsworth except as the effect of any of said instruments may have accomplished that result.

The trial court held that the antenuptial contract revoked the will and that its admission to probate should be set aside; that the antenuptial contract, as modified by the supplemental contract, should stand; that the deed in escrow should be delivered to the heirs and devisees of Lucy Dunsworth and that her estate was entitled to recover from the B. W. Dunsworth estate the sum of $1,000, and a further sum representing the $25 per month payments under the supplemental contract subject to a payment on account made. Its judgment for partition of all real property of B. W. Dunsworth, not including that in the deed to Lucy, need not be specifically noticed.

Those persons claiming under Lucy B. Dunsworth and the administrator with the will annexed of her estate appeal. The general effect of the assignments of error is that the trial court erred in holding the will of B. W. Dunsworth was revoked by the subsequent antenuptial contract, and in holding that the supplemental contract was legally sufficient.

A determination of this appeal compels consideration of a number

of matters. It was early held in this state, and subsequently restated, that contracts, either made before or after marriage, the purpose of which was to settle property rights between the husband and wife, were to be liberally interpreted to carry out the intention of the persons making them. For such contracts to be upheld, it must appear they were fairly and understandingly made, were just and equitable in their provisions, and that there was no fraud or overreaching, but where the contract withstood such test, it was binding and enforceable. Among our cases discussing such contracts are the following: *Hafer v. Hafer,* 33 Kan. 449, 6 Pac. 537; *Matney v. Linn,* 59 Kan. 613, 54 Pac. 668; *King v. Mollohan,* 61 Kan. 683, 60 Pac. 731, 61 Pac. 685; *Casey v. Casey,* 84 Kan. 380, 113 Pac. 1047; *Henry v. Butler,* 87 Kan. 122, 123 Pac. 742; *Gordon v. Munn,* 87 Kan. 624, 125 Pac. 1; Id., 88 Kan. 72, 127 Pac. 764; *Watson v. Watson,* 104 Kan. 578, 180 Pac. 242, 182 Pac. 643; *Keller v. Keller,* 121 Kan. 520, 247 Pac. 433, 49 A. L. R. 113; *Pattison v. Pattison,* 129 Kan. 558, 283 Pac. 483. In the case before us, it is not contended that the contract was not fairly and understandingly made. We shall hereafter mention the specific complaints made with reference to the contract, but waiving them for the moment, it may be said an examination of the contract shows that it provided a just and equitable settlement of property rights.

Appellants contend that the antenuptial contract offends against public policy and is unenforceable in that it invites and encourages a separation of the parties and in effect is not conducive to a continuation of the marriage contemplated by the contract. In support they cite *Neddo v. Neddo,* 56 Kan. 507, 44 Pac. 1. An examination of that case shows the question arose in a suit for divorce and involved a contract materially different from the one now before us. There the contract, set out in full in our reports, made no provision for property rights except in case of separation or divorce, and made no provision as to property rights otherwise save the right to make a will. In the contract before us, it is true that there is a provision that in event of separation or divorce, neither party should make claim to the property of the other, but that provision is consistent with all other provisions of the contract. The provision in the contract before us is an incident to the whole and not the main purpose of the contract. Nor do we have before us a question of rights arising because of separation or divorce. The contract is fully executed and those questions are now immaterial. It would seem that under

*Sanger v. Sanger,* 132 Kan. 596, 296 Pac. 355, appellants cannot here contend the contract is unenforceable.

Appellants also contend that the so-called supplemental contract is not valid, as there was no consideration for it, and therefore, assuming the first contract to be valid, it must stand unchanged. This affects the amount due from the B. W. Dunsworth estate. We do not so construe the supplemental agreement. As we construe it, it means no more than that there was a question as to the first contract's accurately expressing the agreements of the parties before it was executed, and upon due consideration, both parties agreeing, it was amended by the supplemental contract so as to speak the truth.

The principal question raised by the appeal is whether the effect of the execution of the antenuptial contract was to revoke the previously executed will. Whether this resulted requires consideration of our statute on wills and a review of some of our decisions with reference to revocation. It may first be observed there is no question that the will was executed in a formal manner and was not revoked unless by reason of the antenuptial contract, and as to that contract that it was witnessed in the same manner necessary to the formal execution of a will.

For our purposes, our statute with reference to revocation of a will (G. S. 1935, 22-241) was made as follows:

"A will shall be revoked by the testator tearing . . . with the intention of revoking it . . . or by some other will or codicil in writing executed as prescribed by this act, or by some other writing signed, attested and subscribed in the manner provided by this act for the making of a will . . ."

Appellants direct our attention to *Caeman v. Van Harke,* 33 Kan. 333, 6 Pac. 620, in which an effort was made to set aside probate of a will for the asserted reason it was revoked by a later will which had been destroyed. It was held that:

"To maintain the issue in such an action, it is incumbent upon the plaintiff to show that the later will, or revoking instrument, was signed, attested and subscribed with all the solemnity and formality prescribed by the statute for the making of a will." (Syl. ¶ 2.)

And in *Hill v. Kennedy,* 134 Kan. 560, 7 P. 2d 88, a quite similar case, a like holding was made. The case before us, however, does not involve a second will, but a contract which appellees contend was "some other writing signed, attested and subscribed in the manner provided by this act for the making of a will."

354

There is no contention here as to the execution of the contract being sufficient under the above statute, but rather the question is whether it was legally sufficient in its terms to constitute a revocation. The contract contained no specific revocation. Doubtless if it had, there would have been no controversy. What must "some other writing" contain to effect a revocation? In *Derr v. Derr*, 123 Kan. 681, 256 Pac. 800, the testator had made a will. Later he became dissatisfied and executed another will making disposition more favorable to the children of one son than to the children of another whose mother had displeased him. Some months later he became in need of hospital treatment and refused to go until he could destroy the second will. Not being able to get possession of the second will, he signed an instrument in writing to the effect: "I wish my first will to be in effect this date." It was duly witnessed. In disposing of a contention that this instrument did not have the effect of revoking the second will, this court said:

"It was suggested in the briefs in this court that the trial court was of the view that the instrument of October 26, 1925, did not have the effect of revoking the will of May 19, 1925, because it did not specifically state that the same was revoked. The words used are not so important. The real test is whether the words used are inconsistent with the continued vitality or validity of the will of May 19, 1925. A will may be revoked either expressly or by implication. If a later instrument makes a disposition of property inconsistent with the terms of a will, or uses language from which it is clear that the intention of the testator was that such will should no longer continue to be a valid will, its necessary effect is to revoke such will, even though the word 'revoke' is not used." (p. 685.)                                    .

The question of sufficiency of an instrument as revoking a will was also under consideration in *Mann v. Haines*, 146 Kan. 988, 73 P. 2d 1066, where it was claimed a will offered for probate had been revoked by a subsequently executed, but lost, will. In discussing methods of revocation and sufficiency of the revoking instrument, it was said:

"A will may consist of any number of instruments. (*Derr v. Derr*, 123 Kan. 681, 687, 256 Pac. 800.) G. S. 1935, 22-241, merely designates the various methods or manners in which a will may be revoked. One of them is by means of a subsequent will. Whether such later will in fact revokes a previous will depends upon its terms and provisions. In order for a will to work a revocation of a former will it must appear the latter revoked the former by express terms or that its provisions are so far inconsistent with the former as to make it impossible for the two instruments to stand together. To the extent they cannot stand together the latter, of course, operates as a revocation

of the former, but not otherwise. These principles are not only firmly established in this jurisdiction, but almost universally. (*Caeman v. Van Harke,* 33 Kan. 333, 6 Pac. 620; *Derr v. Derr,* supra; *Hill v. Kennedy,* 134 Kan. 560, 7 P. 2d 88.) See lengthy annotation, 51 A. L. R. 652. In the absence of proof of subsequent revocation, the probated will must stand, as the legal presumption is it continued to exist until the death of the testator. (*Caeman v. Van Harke* and *Hill v. Kennedy,* supra.)" (p. 992.)

Under these decisions, the question is whether the provisions of the antenuptial contract are so inconsistent with the terms of the will that the two cannot stand together. If they are absolutely inconsistent, the will must be deemed revoked.

The will is simple in its terms, and had there been no antenuptial contract, under it all property of B. W. Dunsworth would have gone one half to his widow and the other half to his children, regardless of its location or character. Did the antenuptial contract make provision consistent or inconsistent with such a disposition? Insofar as each party is concerned, it is to be observed that he or she agreed not to assert any claim in the property of the other, relinquished to the heirs, devisees, etc., of the other any share he or she would be entitled to as surviving husband or wife, and each agreed to execute to the legatees, heirs, etc., of the other any necessary papers to make his agreement effective. Further, B. W. Dunsworth agreed to pay his intended wife the sum of $1,000 in cash, payable out of his estate at death, a further sum of $25 per month out of his estate as long as they lived together as man and wife if she survived him and if he survived her to pay her estate that amount, in addition to which he conveyed to her certain real estate. Although the method of conveyance was not strictly in accord with the contract, the net result was the same and she became absolute owner of this property. If the will be allowed to stand, the widow would get all the property coming to her by the contract and one half of the property possessed by B. W. Dunsworth at his death. Is the contract susceptible of that interpretation? It is suggested that the portion granted by the contract may be considered somewhat in the nature of an advancement and that the widow would be entitled to one half of all, but charged with what she had received. As we view the matter, to so hold would in effect require us to make a contract for the parties they did not make for themselves.

Our attention is also directed to the provision of the contract that either party had the right to dispose of his or her separate property

by will, and that B. W. Dunsworth knew he had a will, and by not specifically revoking it, intended that it should stand. The contract is hardly susceptible of that interpretation. It does not refer to any will already in existence; there is no consent to the terms of any existing will; the language is that "either party shall have the right to dispose of by will," which in the context of the paragraph of which it is a part and of the whole contract, seems more apt language to use with reference to a will to be made in the future than one then in existence. Had it been the intention to obtain consent of the prospective wife to an existing will, much more appropriate language would surely have been used. And this is especially true when it is borne in mind that the terms of the old will were such that her consent to it, had it been intended it should remain effective, would have been almost an idle gesture.

The contract, as we view it, clearly shows that it was intended that the property rights between the parties to it were fixed by its terms, and by its terms alone. For appellants to prevail, it would have to be said that B. W. Dunsworth intended that his prospective wife should, in event of his prior death, take not only what the contract provided, but under the terms of a will executed over a quarter of a century before, take in addition one half of his remaining estate. The repeated statements of the contract as to the interest of each in the property of the other are not in harmony with the terms of the will. If its probate be upheld, Mrs. Lucy Dunsworth, or her legatees or devisees under her will, as the case now is, would receive property which a mere reading of the contract shows it was never intended she should have.

We are of the opinion that the terms of the antenuptial contract, and the provisions for disposition of property therein, are so inconsistent with the terms of the will of B. W. Dunsworth that the will was revoked thereby, and that the judgment of the trial court to that effect was correct.

In the briefs there is argument and citation of authority on appellees' contention that if the will was not wholly revoked by the antenuptial contract under G. S. 1935, 22-241, there was revocation under the provisions of G. S. 1935, 22-236 and 22-237. By reason of our conclusions as above stated, it is not necessary we discuss the latter contention nor refer to decisions bearing on it.

The judgment of the trial court is affirmed.