No. 47,169

In the Matter of the Estate of Marcellus M. Murdock, Deceased. Paula Murdock, Janet M. Jennings, David Colwell and Vici Colwell McComb, *Appellants* and *Cross Appellees*, v. Victoria Bloom, Marsh M. Murdock, and The First National Bank In Wichita, Executor, *Appellees* and *Cross Appellants*.

(519 P. 2d 108)

Opinion filed January 26, 1974.

*Verne M. Laing,* of Morris, Laing, Evans, Brock and Kennedy, Chartered, of Wichita, argued the cause, and *Ken M. Peterson,* of the same firm, was with him on the briefs for the appellant and cross appellee Paula Murdock.

*Paul R. Kitch,* of Fleeson, Gooing, Coulson and Kitch, of Wichita, argued the cause, and *Thomas D. Kitch,* of the same firm, was with him on the briefs for the appellants and cross appellees Janet M. Jennings, David Colwell and Vici Colwell McComb.

*Bryson E. Mills,* of Mills and Baehr, of Wichita, argued the cause, and *Ronald K. Badger,* of Wichita, was with him on the brief for the appellee and cross appellant Victoria Bloom.

*H. E. Jones,* of Hershberger, Patterson and Jones, of Wichita, argued the cause, and *Stephen Jones,* of the same firm, was with him on the brief for the appellee and cross appellant Marsh M. Murdock.

*Charles W. Harris*, of Weigand, Curfman, Brainerd, Harris and Kaufman, of Wichita, argued the cause, and *Lawrence Curfman*, of the same firm, and *Sidney J. Brick*, of Wichita, were with him on the briefs for the appellee and cross appellant The First National Bank in Wichita, executor.

The opinion of the court was delivered by

HARMAN, C.: Presented here are appeals from summary judgment holding that an antenuptial contract was valid and enforceable against a decedent's estate. Consolidated with them are later appeals from awards of attorneys' fees.

There is no dispute in the facts pertinent to the litigation.

On June 24, 1940, Marcellus Murdock and Paula Vaughan entered into the agreement in question. Marcellus was then fifty-seven years of age; Paula was forty-four. Marcellus had four adult children by a previous marriage which had been dissolved by death; Paula had no children.

The introductory portion of their written agreement stated the parties' desire to settle all questions as to rights of each in and to the property of the other during the continuance of their marriage and "after separation by death or otherwise." In it each party relinquished any claim to the property of the other during the continuance of the marriage and "after separation by death or otherwise"; each was to separately own and have the right to alienate his or her property as though the marriage relationship had not been entered. There was a further proviso that "if [Paula] shall be living with [Marcellus] as his wife at the time of his death" she was to receive as her absolute property the homestead, all household furniture, the family automobile and, in addition, a child's share of Marcellus' estate. Each party made full disclosure of ownership of property at the time the agreement was made.

Marcellus and Paula were married July 3, 1940.

The next significant event was the creation by Marcellus on December 27, 1941, of an *inter vivos* trust, designed to terminate two years after his death, the principal asset of which was 10,000 shares of capital stock of The Wichita Eagle and Beacon Publishing Co., Inc., which stock constituted one-half of Marcellus' one-third ownership of that corporation. The beneficiaries of the trust were Marcellus' wife, Paula Murdock, one-fifth share; his son, Marsh M. Murdock, and his two daughters, Victoria Bloom and Janet Jennings, one-fifth share each; and his grandson, David Colwell, and his granddaughter, Vici McComb, children of a

deceased daughter, Jane Colwell, one-tenth share each. Marsh and The First National Bank in Wichita were named co-trustees of this trust. It appears the same parties to this appeal have had litigation over voting rights in this stock and in an identical block owned by Marcellus at the time of his death; however, that litigation, involving control of the publishing company, plays a part here only as it concerns allowance of attorneys' fees against Marcellus' estate.

Following their marriage Marcellus and Paula lived together twenty-four years but in 1964 Marcellus moved out of the Wichita home in which he and Paula had been living and thereafter the couple remained apart. Paula continued her residence in the family home. During the ensuing six years Marcellus provided for Paula's support. Neither party ever commenced a court proceeding affecting the marital relationship.

On September 28, 1966, Marcellus executed his last will and testament. Paula never consented to this will. Generally the will created five fifteen-year trusts of equal proportions of the testator's estate. One trust for Paula's benefit (denominated Trust "A" in item Third); one each for the benefit of son Marsh and daughters Victoria Bloom and Janet Jennings; and one for grandchildren David Colwell and Vici McComb. Each beneficiary was to have the net income from each trust during his or her lifetime; in event of the death of any beneficiary prior to the trust's termination his share was to be distributed according to the beneficiary's testamentary direction or, in the absence of such direction, to the beneficiary's heirs at law. Additionally, the will (in item Second) gave to Paula the homestead, all household furniture and the family automobile. However, all bequests to Paula were made conditional by reason of a proviso as to each that it "shall remain valid and enforceable only if my said wife, Paula Murdock, shall at the time of my death be living with me as my wife in accordance with the provisions of the said written agreement dated the 24th day of June, 1940, otherwise the bequest . . . shall be null and void and of no force and effect".

Marsh and The First National Bank in Wichita were named co-executors of the will and co-trustees of the testamentary trusts created therein.

On February 16, 1967, Marcellus signed a paper which was denominated codicil to his last will and testament. This document stated that in regard to the bequests to Paula ". . . it is

my express intention that these provisions be construed by taking into consideration that Paula Murdock is not now living with me as my wife, and that under the present facts and circumstances as they now exist, it is my intention that the bequests in item Second and Trust 'A' in item Third shall be null and void and of no force and effect." This instrument was found among other documents in Marcellus' safety deposit box at the First National Bank in Wichita following his death. His signature on the codicil was never attested to by any witnesses.

Marcellus died March 10, 1970, leaving as his heirs at law his widow Paula, his children Marsh, Victor and Janet, and his grandchildren David and Vici.

Thereafter, Marcellus' will was duly admitted to probate in the probate court of Sedgwick county. The First National Bank in Wichita qualified as executor (apparently Marsh did not so qualify by reason of his removal to California). The principal asset of the estate consisted of the remaining block of 10,000 shares of stock held by the decedent at the time of his death in The Wichita Eagle and Beacon Publishing Co., Inc.

On August 26, 1970, Paula filed in the probate court a petition for allowance of demand wherein she claimed one-fifth of the decedent's estate under the antenuptial agreement. The executor bank filed its answer admitting that the antenuptial agreement was in full force and effect at the time of decedent's death but it denied other allegations in Paula's petition and asked that she take nothing by reason thereof. Before further action was taken on her petition Paula withdrew it and filed, timely, her election to take under the law of intestate succession. Subsequently she filed a petition for allowance of demand under the terms of the antenuptial agreement contingent upon denial of her election for any reason.

On April 9, 1971, Paula filed a petition for distribution in which she requested that an undivided one-half of decedent's estate be distributed to her. Thereafter, decedent's daughter, Janet Jennings, and his two grandchildren, David Colwell and Vici McComb, filed an instrument denominated "Petition in Support of Election of Paula Murdock" wherein they asked that one-half of the estate, together with statutory allowances, be distributed to Paula. The executor filed an answer in which it generally denied all allegations in Paula's petition except those as to the widow's residence, its appointment as executor and that the antenuptial agreement was

in full force and effect, and it prayed that the provisions of the antenuptial agreement and the will be construed and its rights and duties and those of Paula be determined. At the same time decedent's daughter, Victoria, and his son, Marsh, filed a joint answer opposing Paula's petition for distribution and alleging that the antenuptial agreement constituted her consent to the will and she was entitled to no more than one-fifth of the estate.

On May 19, 1971, the probate court ruled that the antenuptial contract was valid and as a result Paula was entitled to an undivided one-fifth interest in the decedent's estate. Paula appealed this decision to the district court and thereafter Victoria also appealed.

In the district court Paula, Janet, David and Vici filed a motion for summary judgment allowing Paula's claim for one-half the estate. They alleged the antenuptial agreement was against public policy because it encouraged divorce, separation or abandonment and was therefore void. Marsh then filed a motion for summary judgment in which he requested that the antenuptial agreement be held valid and enforceable. His position was that Paula was thereby entitled to a one-fifth share of the estate as decreed by the probate court.

During the hearing of these motions Victoria orally moved for summary judgment that Paula was entitled to nothing from the estate either under the antenuptial agreement or the will. At this hearing all parties agreed the antenuptial agreement was clear and unambiguous. Counsel for the parties made oral statement of the facts and agreed, both tacitly and expressly, that there were no material issues of fact in the case. The trial court overruled the motions of Paula and her supporters and of Victoria; it sustained Marsh's motion, ruling that the antenuptial agreement was valid and enforceable and Paula was thereby entitled to a one-fifth share of the estate without intervention of the trust provision in decedent's will. The court's rationale for its ruling was embraced in the following oral comments:

"The law favors antenuptial agreements and wherever possible they are to be enforced as any other contract is enforced. The instant agreement was executed by Paula Murdock and Marcellus M. Murdock. It was drawn by one Howard Fleeson. The record is not clear as to whether he was counsel for both parties or for one party or the other. The terms of the antenuptial agreement are clear and unambiguous. The parties executed this agreement some thirty years prior to the death of Marcellus Murdock. The term 'or otherwise' as contained in the antenuptial agreement and allegedly gives rise to an ambiguous nuptial agreement is mere surplusage and does not add to or take

from any of the provisions of the antenuptial agreement, and in passing the Court notes that the phrase 'by death or otherwise' was also contained in the contract in the Hafer case cited in the brief submitted by Mr. Frank.

"The antenuptial agreement being clear and unambiguous, thereby follows that the terms of that agreement are enforceable and must be enforced by the Court. We then get to the term 'shall be living with the deceased as his wife at the time of his death.' Because of the fact the parties were separated at the time of death a legal construction must be given to the meaning of that term, and it must be legally construed as to whether or not the one-fifth interest prevails or if under the terms of the agreement no interest in the estate of Marcellus M. Murdock exists. The existence of marital relationship is desired by the law and is therefore to be encouraged. In this case there was a separation. It was not a legal separation in the sense that there was no decree of the Court ordering or adjudging any separation of the parties through a separate maintenance action or otherwise, there was no attempt to proceed with any divorce action, and thereby the marital status of the parties was in existence at the time of the death of Marcellus M. Murdock. By reason of this, the Court finds the phrase 'living with' somewhat out of context 'as his wife,' that there has been no actual severance of the marital relationship so deliberate and complete that it is obvious that the wife no longer looks to the husband for support and the husband does not provide support to the wife. There is no reason to believe that a reconciliation was impossible, and because of favor of the marital relationship in the eyes of the law presumption might be said to be just the contrary, that the separation of the parties might have or would have ended and they would have resumed the normal relationships anticipated when a marital relationship exists."

Paula, Janet, David and Vici have appealed from the trial court's order denying their motion for summary judgment; Victoria has cross-appealed from the denial of her motion for summary judgment.

Upon appeal the parties substantially reassert their positions in the district court. Elaborating, it may be said Marsh and the executor contend Paula should have only the child's share plus allowances granted her under the antenuptial agreement; Victoria likewise asserts the antenuptial agreement is valid and enforceable and constitutes consent to the will but she contends Paula can take nothing under it, or the will, because she was not "living with [the decedent] as his wife at the time of his death" as provided in those instruments. As indicated, the essential contention of appellants Paula, Janet, David and Vici is that the antenuptial contract offends public policy and is unenforceable because it invites and is conducive to divorce or separation. They point to the rule stated in *In re Estate of Cooper*, 195 Kan. 174, 403 P. 2d 984, as follows:

"The general rule in this state is that contracts, made either before or after marriage, the purpose of which is to fix property rights between a husband and wife, are to be liberally interpreted to carry out the intentions of the makers,

and to uphold such contracts where they are fairly and understandingly made, are just and equitable in their provisions and are not obtained by fraud or overreaching. Generally speaking, such contracts are not against public policy, although a different rule obtains where the terms of the contract encourage a separation of the parties. . . ." (Syl. ¶ 1.)

The foregoing exception to the general rule favoring antenuptial contracts finds derivation in a divorce case strongly relied upon by appellants here, *Neddo v. Neddo*, 56 Kan. 507, 44 Pac. 1. There the prospective wife was thirty-seven years of age, had three children by a former marriage and owned property worth about $50.00; the prospective husband was forty years old and owned property valued at about $17,000. Their antenuptial contract provided that if the parties should fail to live together amicably, and should separate, neither could claim any interest in the property of the other. In the divorce proceeding the trial court found that the plaintiff husband had, after nearly fourteen years of married life, abandoned the wife without just cause or provocation and it declined to enforce the premarital agreement. This court affirmed, holding that inasmuch as the state has an interest in preserving the marriage relationship, a contract which by its terms invites and encourages divorce or separation as a source of pecuniary profit to either party is against public policy and will not be upheld.

The second decision principally relied upon by appellants is *Fincham v. Fincham*, 160 Kan. 683, 165 P. 2d 209, also a divorce action. There the parties' antenuptial contract made provision for division of the property upon death and further provided that if they separated for any reason whatsoever the husband would pay the wife $2,000 as a complete settlement of all marital rights. The trial court held that the husband, who sought the divorce and who owned property valued at about $160,000 at the time the contract was executed, could not enforce the latter provision of the contract. As to this aspect this court affirmed, saying "The price agreed upon for their cohabitation was the same whether for a day, a month, or longer, namely $2,000. In that respect the contract was against public policy insofar as either party was concerned." (p. 688.) It was held:

"Public policy relating to marriage is to foster and protect it, to make it a permanent and public institution, to encourage the parties to live together and to prevent separation.

"A separation provision in an antenuptial contract which permits the parties to separate at any time and for any cause whatsoever, whether legal or otherwise, and in which the wife relinquishes all rights she may have against the husband personally and in and to his property, on terms that are unreasonable

and inequitable, tends to encourage separation and to defeat the marriage relation, is contrary to public policy and unenforceable by either party." (Syl. ¶¶ 2, 3.)

Appellants here also point to the unattested codicil signed by the decedent as further indication the antenuptial agreement constituted an illegal bargain inviting separation in that it manifested the decedent's intent that Paula should take nothing under that contract in the event they separated. Respecting this contention, it may be said all parties, including appellants, have agreed that the language in the antenuptial contract is clear and unambiguous. This being true, resort to extrinsic evidence of intent, such as the so-called codicil executed nearly twenty-seven years after the contract in question, is improper. The applicable rule was iterated in *Boxberger v. Cotten, Executor,* 206 Kan. 456, 479 P. 2d 869, thus:

"Where an antenuptial contract is clear and unambiguous, the terms thereof must be construed in such manner as to give effect to the intention of the parties at the time they entered into the contract, and this must be determined from the four corners of the instrument itself without the aid of parol evidence. Words cannot be read into the agreement which impart an intent wholly unexpressed when it was executed." (Syl. ¶ 3.)

Appellants also urge that the antenuptial agreement remained executory since Paula and Marcellus where physically separated at the time of the latter's death. This latter contention apparently is made to avoid the impact of certain of our decisions respecting antenuptial contracts wherein one of the contracting parties had died, as distinguished from cases in which both were living and one had sought divorce as in *Neddo* and *Fincham.* Several in this first line of decisions are relied upon by appellees Marsh and the executor. In *Dunsworth v. Dunsworth,* 148 Kan. 347, 81 P. 2d 9, an antenuptial agreement contained the following clause:

" 'And in case of separation or divorce, neither will assert or claim any right, title or interest in the property of the other owned at the date of said marriage.' " (p. 349.)

The husband predeceased the wife and in claims between their respective estates this court made distinction between a divorce case and a claim against a decedent's estate in determining whether an antenuptial contract offended public policy by encouraging separation or divorce, as follows:

"Appellants contend that the antenuptial contract offends against public policy and is unenforceable in that it invites and encourages a separation of the parties and in effect is not conducive to a continuation of the marriage contemplated by the contract. In support they cite *Neddo v. Neddo,* 56 Kan.

507, 44 Pac. 1. An examination of that case shows the question arose in a suit for divorce and involved a contract materially different from the one now before us. There the contract, set out in full in our reports, made no provision for property rights except in case of separation or divorce, and made no provision as to property rights otherwise save the right to make a will. In the contract before us, it is true that there is a provision that in event of separation or divorce, neither party should make claim to the property of the other, but that provision is consistent with all other provisions of the contract. The provision in the contract before us is an incident to the whole and not the main purpose of the contract. Nor do we have before us a question of rights arising because of separation or divorce. *The contract is fully executed* and those questions are now immaterial." (Emphasis supplied.) (p. 352.)

The holding in *Dunsworth* subsequently received approval in *Fincham,* thus:

"In the Dunsworth case it was definitely stated that no question of rights arising because of separation or divorce was involved; that the contract had been fully executed by the parties; and the validity of the separation provision was no longer material." (p. 692.)

For present purposes, this can only be interpreted as holding that an antenuptial contract which provides for division of property upon the death of one of the parties becomes an executed contract when that event occures.

A somewhat analogous situation was presented in *Boxberger.* There the agreement was premised upon settlement of the betrothed parties' property rights "upon the termination of such marriage relationship—in case of death" and contained a proviso that if the wife survived the husband *as his widow* the husband would devise certain property to her. The husband died. The widow renounced the husband's will made consonant to the antenuptial agreement and filed her election to take instead under the law. The widow contended, as here, that the antenuptial contract was against public policy and void. The trial court upheld this view concluding the contract would govern settlement of their propery rights in event of divorce and that it gave the decedent a substantial pecuniary benefit in procuring a divorce. Upon appeal this court reversed, saying:

"In our opinion the trial court's conclusion that the antenuptial agreement is void on the ground it 'creates an incentive to cause a divorce' is erroneous. . . . The operative words relating to the devise by the decedent are 'if First Party [Mary] shall survive him as his widow.'

"The only limiting words in the agreement are that Mary survive the decedent as his widow. On the facts of this case she did survive him. Ambiguity results from the use of words capable of two or more meanings. An agreement conditioned upon a single fact, survival as widow, means just one

thing—that the parties be married at the death of the husband. On the facts of this case they were married upon the death of J. Ben Boxberger.

"The trial court's conclusion that the agreement of the parties would control a settlement of their property rights in the event of divorce, and that the decedent had a substantial pecuniary benefit in the procurement of a divorce, is unfounded. The parties to the antenuptial agreement here in question made no agreement whatever concerning property rights in the event of divorce. The only logical construction of the contract is that the property rights of the parties would be determined by the court in a divorce proceeding without reference to the agreement, since it dealt only with property rights in the event of death. The contract created no obligation or undertaking for either party in the event of divorce. Neither party agreed to do, or not to do, any act, nor did either party waive any right in the event of a divorce." (pp. 461-462.)

In *Sanger v. Sanger,* 132 Kan. 596, 296 Pac. 355, this court was asked to strike down an antenuptial agreement because it was conducive to divorce. The contractual clause respecting divorce was as follows:

' "If, however, the said Flora Johnson shall fail to live with the said John H. Sanger after the said marriage, for any cause, or shall fail to be a good and true wife, or shall fail to perform her duties as such to the time of his death, then, and in that case, the said Flora Johnson hereby agrees that she shall not receive under any conditions, or claim from the said John H. Sanger, or his estate to exceed the sum of two thousand 00/100 dollars, which sum shall be paid at the time she fails to comply with said conditions and shall leave the said John H. Sanger.' " (p. 597.)

The contracting parties thereafter married and lived together until the husband's death. The wife then claimed a widow's one-half share in his Kansas real estate—a greater share than was her due under another provision of the antenuptial contract. The trial court denied her claim. Upon appeal this court affirmed, saying:

"Appellant argues that the antenuptial contract is by its terms against public policy and void. In support of this view she cites the provisions by which John H. Sanger agreed that if she lived with him until his death she would receive the share the law of Nebraska gives her, but if she did not live with him until his death 'for any cause,' then she should receive only $2,000. It is argued that this invites disagreement and abandonment, such as was condemned by this court construing the antenuptial contract before it in *Neddo v. Neddo,* 56 Kan. 507, 44 Pac. 1. We note, first, there was no abandonment in this case, or failure to perform marital duties, hence the provision in the contract as to the sum the wife should have in such a case never has had facts upon which to operate, and under the situation now presented the contract should not be held void for that reason, even if that provision were against public policy." (pp. 597-598.)

Noteworthy in *Sanger* is the fact that despite explicit mention of divorce in the parties' contract, that agreement was not invali-

dated as being against public policy. We think the same conclusion must be reached here wherein the agreement contained no specific language purporting to divide property in event of a divorce and where the contract became executed by death rather than by decree dividing property in a divorce or legal separation (see also *In re Estate of Cantrell,* 154 Kan. 546, 119 P. 2d 483).

In reaching the conclusion that this agreement does not violate public policy and is enforceable as against the widow and the estate, as we do, we have not overlooked appellants' further contention that the trial court erred in ruling that the words "or otherwise" contained in the premising phrase of their agreement were mere surplusage. Appellants argue these words really were intended to refer to any kind of separation including divorce. Perhaps, but if so, the result is not changed as demonstrated by the line of cases wherein the contract has become executed by the death of one of the parties, and provision for property settlement in event of divorce or legal separation has been held merely incidental to the main purpose of the agreement as in *Dunsworth.*

It appears from our cases that the words "after separation by death or otherwise", as premising language for scriveners in antenuptial contracts, have become more or less standard terminology since their use in the landmark decision of *Hafer v. Hafer,* 33 Kan. 449, 6 Pac. 537, a death case. There the identical phrase appeared in the contract, which contract was upheld by this court.

Appellants also have asserted summary judgment should not have been rendered against them without trial of the issue of the fairness of the antenuptial agreement as a whole. Appellants simply are in no position to raise this issue upon appeal because it was never presented to the trial court. To the contrary appellants expressly stipulated upon the hearing of the three motions for summary judgment that there were no material factual issues to be considered.

Cross appellant Victoria Bloom concurs in the conclusion the antenuptial agreement is valid and enforceable at death but she asserts Paula is entitled to take nothing under it because she failed to live up to it—she was not "living with [Marcellus] as his wife at the time of his death" as therein provided. She asserts Marcellus was forced by Paula to move out of the family home in 1964 but she concedes, as she must, the record does not support this factual assertion. The only facts revealed by the record are that after Marcellus' departure Paula continued to live in the

home in Wichita in which they had been previously residing and that Marcellus supported Paula. There were no legal proceedings affecting the marital status. Nor, as already indicated, can the so-called codicil be taken into account in determining the parties' intent.

In considering the meaning of the phrase "if [Paula] shall be living with [Marcellus] as his wife at the time of his death", we find no precedent of our own; however, other courts have considered similar language. In *Widener v. Celebrezze,* 242 F. Supp. 883 (USDC, W. D. Va.), an action for social security benefits, the court had to determine whether at the time of the wage earner's death he and the plaintiff did "reside together as husband and wife" within the meaning of a Virginia statute validating certain marriages previously void, though the parties were physically separated by choice due in part to strained personal feelings toward each other. The court stated:

". . . [I]n Wright v. Bank of Southwestern Georgia, 13 Ga. App. 347, 350, 79 S. E. 184, 186 (Ct. App. 1913), the court construed the phrase 'living together' to imply merely that there has been no separation, voluntary or legal, which can legally be said to have released either of the marital parties from their duty to the other under the strict letter of the law; the phrase does not always import that the parties are living at the same place." (p. 886.)

And in *Boen's Dependents v. Foster, et al.,* 241 Miss. 520, 130 So. 2d 877, a workmen's compensation case, the court had this to say:

"The weight of authority is to the effect that a wife is deemed to be living with her husband unless there has been an actual severance of marital relations so deliberate and complete that it is obvious that the wife no longer looks to the husband for support." (p. 525.)

The trial court concluded the parties had in mind a legal separation such as divorce or separate maintenance decree in which the wife might have something more than voluntary action upon her husband's part in discharging his obligation to support her. We agree and Paula must be deemed to have performed her part of the bargain intended by the parties. She remained in the family residence during which time she was supported by her absent spouse. Accordingly, we hold the trial court did not err in denying Victoria's motion for summary judgment and in holding Paula was entitled to a one-fifth share, plus allowances, in the estate as provided by the contract.

Coupled with the principal appeals are others concerning attorney fees and expenses allowed by the trial court for counsel for all parties who have appeared in the case in connection with Paula's

claims against the estate. Two hearings at which evidence was offered were held on this aspect. Timely appeals were thereafter filed from the final orders made.

Appellants contend none of the parties is entitled to have his or her attorney fees and expenses paid out of the estate; they state they offered their evidence on these items and claimed them on the contingent basis that if fees and expenses were to be allowed as requested by the other parties, theirs should likewise be allowed. Some of their challenges to the allowance of fees for the various parties are in the alternative and will be dealt with accordingly. We should note, however, that on oral argument before us appellants abandoned their contentions the trial court erred in assessing against the estate certain of appellees' attorneys' fees which were incurred wholly or partially with the voting rights' litigation rather than the widow's case against the estate. Appellees have cross-appealed from the orders allowing attorney fees and expenses for appellants' counsel. Various reasons are asserted for the parties' positions, not all of which need be discussed in view of our disposition.

Generally, it may be said attorney fees and expenses may not be allowed unless authorized by statute (*In re Estate of Reynolds,* 176 Kan. 254, 270 P. 2d 229). Two statutes are relied upon by the parties. The first is K. S. A. 59-1504 which provides:

"*Compensation and expenses.* Whenever a decedent by will makes a provision for the compensation of his executor, that shall be taken as his full compensation, unless he files a written instrument, renouncing all claim to the compensation provided for in the will. Whenever any person named in a will or codicil defends it, or prosecutes any proceedings in good faith and with just cause, for the purpose of having it admitted to probate, whether successful or not, or if any person successfully opposes the probate of any will or codicil, he shall be allowed out of the estate his necessary expenses and disbursements in such proceedings, together with such compensation for his services and those of his attorneys as shall be just and proper."

In numerous cases this court has held that where a meritorious action is brought to construe a will, attorney fees are allowable under the provisions of the foregoing statute (see *Baldwin v. Hambleton,* 196 Kan. 353, 361, 411 P. 2d 626). In *In re Estate of Reynolds,* supra, this general rule was stated:

". . . Where the services of the claiming attorney have been beneficial to the estate or are necessary for its proper consideration, fees have been allowed attorneys, but where the attorney acts for the benefit of his own client, or for other purposes not helpful in the administration of the estate, such fees are not allowed." (p. 258.)

The second statute, K. S. A. 59-1717, provides:

"*Compensation and expenses.* Every fiduciary shall be allowed his necessary expenses incurred in the execution of his trust, and shall have such compensation for his services and those of his attorneys as shall be just and reasonable. At any time during administration the fiduciary may apply to the court for an allowance upon his compensation and upon attorneys' fees."

Appellants assert attorney fees and expenses should not have been awarded on behalf of Marsh and Victoria because this litigation did not involve the probate or the construction of the will. They assert the sole issue was the validity and construction of the antenuptial agreement. In support of their position they cite *In re Estate of Davis,* 171 Kan. 605, 237 P. 2d 396. There a decedent's divorced wife filed a claim against his estate based on certain postnuptial contracts. In the district court she prevailed upon her claim but was denied anything for counsel fees. Upon her appeal respecting the allowance this court affirmed, saying:

"We find nothing in the section of the statute [59-1504] . . . which can be construed as contemplating that a claimant is entitled to recover attorney's fees or other expenses incurred in the prosecution of a suit in probate court for specific performance of contracts such as are here involved." (p. 613.)

Here the trial court in determining Paula's claims, despite strained contentions to the contrary, was concerned only with the validity and construction of the antenuptial contract. Appellees Marsh and Victoria were not "defending" the will in appearing against those claims. The will has already been admitted to probate and its provisions were not being construed in the sense that a benefit was thereby conferred on the estate.

Appellee Victoria cites and relies on *In re estate of Rooney,* 186 Kan. 200, 349 P. 2d 916 (the second Rooney case), for her position she was defending the will. In that case a decedent's widow was appointed executrix of her late husband's estate, pursuant to his will to which she had previously consented. Immediately afterward she attempted to restrict that consent and she made claim to certain land which in the will was devised to decedent's nephew. The nephew petitioned the probate court to require her to include the land in her inventory of the estate. The probate court denied the nephew's petition but on appeal to the district court it was allowed. From that ruling the widow, personally and as executrix, appealed to this court. This court affirmed in that which may be termed the first Rooney case (*In re Estate of Rooney,* 181 Kan. 1029, 317 P. 2d 416), which opinion discloses the questions involved. Thereafter, upon final settlement of the estate the district court,

upon certification from the probate court, allowed the nephew's attorney fees as a charge against the estate. From that order the executrix again appealed to this court. In the second Rooney case, *supra*, this court affirmed, stating:

"We regard the question presented as rather close, but are inclined to the view that under all of the facts and circumstances of the litigation as shown by our opinion in the former appeal, payment of an attorney fee for Tiller's counsel was a proper charge against the estate." (p. 203.)

The facts in *Rooney* are so different as to render its holding inappropriate here. There the executrix in prosecuting her claim was acting partisanly. She had abandoned the objective role of the fiduciary to the extent no one was representing the legatee nephew for whose benefit, in part at least, the probate proceedings were had. Hence, it was incumbent upon him to defend that portion of the will applicable to him. His appearance in effect filled the gap otherwise existent in the fiduciary representation of the estate, thus warranting allowance of his attorney fees out of the estate. In the case at bar the executor has appeared throughout on behalf of the estate.

In view of the foregoing we must agree with appellants that none of the parties' attorney fees and expenses, including appellants but excluding those of the executor, should have been ordered paid out of the estate and we hold the district court erred in ruling otherwise.

Appellants also challenge allowance of attorney fees and expenses to the executor, this upon the basis the executor's interest was not different from the interests of the beneficiaries who were represented by their own counsel, and further that employment by it of two separate law firms constituted an unnecessary duplication of effort for which the estate should not be required to pay.

Allowance of necessary expenses incurred by an executor in the execution of his duties, including just and reasonable compensation for the services of attorneys employed by him, is specifically authorized by K. S. A. 59-1717. An executor has a duty to collect and preserve the assets of a decedent's estate and in so doing he may employ counsel to assist him (*First National Bank of Topeka, Kan. v. United States*, 23 F. Supp. 19, 29). Here the executor made the first appearance in probate court in response to the widow's initial claim. Thereafter all the beneficiaries named in the will took varying positions, not all of which were consistently maintained, during the course of the litigation. Under these circumstances we think

the executor properly appeared throughout in defense of the estate. The necessity for the particular legal services and the reasonableness of the amount of the compensation to be paid are essentially questions of fact for the tribunal authorized to order their allowance. More need not be said in the light of our further disposition.

An additional question presents itself as to the authority of the district court initially to order allowances for attorney fees and expenses incurred by the executor. The probate court had never acted upon the matter of payment for the particular services and items in question (it did order a partial allowance of attorney fees for the executor in connection with other services rendered); hence the subject did not reach the district court, as it might have, by way of appeal from an order of allowance.

Under the provisions of K. S. A. 59-301 and cases construing them, the probate court has exclusive jurisdiction of all matters incident and ancillary to the settlement and distribution of a decedent's estate (*In re Estate of Sutcliffe*, 199 Kan. 686, 695, 433 P. 2d 389). Costs of administration, including determination of the amount of an executor's or administrator's attorney fees and expenses, are an important part of that administration and one in which beneficiaries of the estate may be vitally interested. Partial allowance to the executor or administrator for these items during the course of an administration is authorized by 59-1717, as was ordered here, with final determination and allowance, if any, to be made upon final settlement of the estate under K. S. A. 59-2247. This latter statute specifically directs that notice of the hearing on final settlement be given pursuant to K. S. A. 59-2209 in which heirs, devisees and legatees are required to be notified. It goes without saying that where matters are to be determined during the course of an administration which may substantially affect the interests of the beneficiaries, then those beneficiaries may likewise be entitled to some form of notice of the hearing of those matters. It is true that in the instant case all interested parties were before the district court when allowances for the executor's expenses were made but this fact would not confer upon that tribunal jurisdiction otherwise lacking. The initial allowance of costs of administration can best be accomplished in the probate court, which we think is the sense of the statutes governing the matter. Accordingly we hold that the probate court has exclusive jurisdiction initially to determine the amount of an executor's attorney fees and expenses to be charged pursuant to K. S. A.

59-1717 as costs against a decedent's estate being administered in that court. It follows that the trial court had no authority to determine and allow the amount of the attorney fees and expenses of the executor. We are not unaware of the result reached in cases such as *In re Estate of Walton,* 183 Kan. 238, 326 P. 2d 264, and *Baldwin v. Hambleton,* supra, but those cases dealt with costs of litigation allowable under K. S. A. 59-1504 as distinguished from expenses of administration under 59-1717.

The judgment of the district court respecting the validity and construction of the antenuptial agreement is affirmed both upon appeal and cross-appeal; its judgments respecting allowance of attorney fees and expenses are reversed and ordered vacated; the district court is directed to remand the proceedings to the probate court of Sedgwick county for determination of expenses to be allowed the executor, including those for attorney fees, in accordance with the views herein expressed.

APPROVED BY THE COURT.