No. 122,190

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

In the Matter of the Marriage of
SHERRY LYNN NELSON,
*Appellant*,

and

TERRY ALLEN NELSON,
*Appellee*.

SYLLABUS BY THE COURT

1.

Premarital agreements (also called prenuptial or antenuptial agreements) allow parties contemplating marriage to contract with respect to the disposition of property upon separation or marital dissolution. Once a premarital agreement is signed and the parties to the agreement become married, the agreement has the same effect as any other contract.

2.

The interpretation and legal effect of a written contract are questions of law subject to unlimited review. The primary goal in interpreting any written instrument is to ascertain the parties' intent. When the language of a contract is unambiguous, the parties' intent must be ascertained from the four corners of the document—the contract itself— without applying additional rules of construction.

3.

A contract is ambiguous if it cannot be carried out as written because conflicting language renders its meaning unclear. This occurs when a contract's text can reasonably support two or more interpretations.

1

4.

Courts should not strain to find an ambiguity in a contract where in common sense there is none. For this reason, contract terms cannot be read in isolation. Rather, courts review the written document as a whole in order to give effect to the parties' intent.

5.

The aim of interpreting a written contract is to give effect to the parties' intent in entering into that agreement. When a contract is complete, unambiguous, and free from uncertainty, parol evidence—that is, testimony and evidence other than the written contract—of prior or contemporaneous agreements or understandings tending to vary the terms of the contract evidenced by the writing is inadmissible.

6.

When the text of an agreement is subject to multiple reasonable interpretations, a court must still determine what the parties intended the contract to entail. In these circumstances, the parties' meaning is ascertained by considering the language employed, the circumstances existing when the agreement was made, the object sought, and other circumstances tending to clarify the parties' real intentions.

7.

Oral testimony generally cannot be used to vary the terms of a written instrument. This principle, which courts call the parol-evidence rule, is not a rule of evidence but of substantive law whose applicability is for the court to determine. Thus, no contemporaneous objection is required to preserve a question regarding the admissibility of parol evidence for appellate review.

8.

Parol evidence is inadmissible to contradict, vary, change, or restrict the terms of a valid deed, except in instances of fraud or mutual mistake.

9.

When a deed indicates that land is owned by "joint tenants with right of survivorship," courts must give effect to that intention. Parol evidence is not admissible to explain or vary the terms of the instrument.

10.

A Kansas court cannot award attorney fees unless a statute authorizes the award or there is an agreement between the parties allowing attorney fees. Appellate courts may award attorney fees for services on appeal in cases where the district court had authority to award attorney fees.

11.

District courts have broad discretion to award costs and attorney fees to either party in a divorce case as justice and equity require. But parties to a premarital agreement can limit the courts' equitable discretion on any matter, including attorney fees, as long as their agreement does not violate public policy.

Appeal from Marion District Court; MICHAEL F. POWERS, judge. Opinion filed October 2, 2020. Reversed and remanded with directions.

*Stephen M. Turley*, of Wagle & Turley LLC, of Wichita, for appellant.

*Paul E. Dean*, of Putnam & Dean LLC, of Emporia, for appellee.

Before BUSER, P.J., HILL and WARNER, JJ.

3

WARNER, J.: This appeal arises from the divorce decree dissolving the marriage of Terry and Sherry Nelson. Sherry challenges the district court's division of property, arguing the court's order is contrary to the couple's written premarital agreement. We agree. But the proceedings before the district court and the court's resulting order suffer from a more fundamental flaw: They run contrary to longstanding Kansas law that testimony and other parol evidence may not be used to rewrite written property deeds. In light of this error, we reverse the court's division of property and remand the case for further proceedings consistent with this opinion.

FACTUAL AND PROCEDURAL BACKGROUND

Terry and Sherry Nelson were married in 2001. Sometime before their wedding, the Nelsons signed an Antenuptial Agreement that explained how certain property and responsibilities would be distributed in the event of a later divorce or other separation. Relevant to this appeal, the Nelsons' agreement describes three distinct categories of property: marital property, separate property, and jointly titled property.

Section 5 of the agreement, titled "Maintenance of status of Separate Property," contains substantively identical provisions for the individual property each spouse possessed before the marriage. Section 5 indicates that this "separate property" would remain separate and, in the event of a divorce, would not be split between the couple. For example, the paragraph relating to Terry's separate property states in relevant part:

> "It is agreed that the property owned by [Terry] as of the date of marriage of the parties, whether real or personal, wherever located, whether held in trust or otherwise, any profits from or appreciation in said property after the date of marriage, . . . shall remain and be his sole and Separate Property, under his sole dominion and control, including the right to assign, encumber, sell, deal with generally and dispose of by Deed . . . or otherwise, as if he were unmarried, irrespective of where the parties now or hereafter may reside, and that [Sherry], by reason of the contemplated marriage, shall not acquire for herself . . . any

4

interest in said property . . . or any substitute or additional properties acquired with and from the proceeds resulting from the sale of or income from said property."

Section 9, titled "Termination of marriage by divorce or decree of separate maintenance," explains how different types of property—marital, separate, and jointly titled—would be divided if the Nelsons were to divorce:

"(a) The parties' Marital Estate, as defined in paragraph 8 hereof, shall be divided equally between them.

"(b) The parties' Separate Properties, as defined in paragraphs 5 and 6 above and including each party's personal effects, shall not be subject to a division of property by any court.

"(c) Any properties titled in the names of the parties as joint tenants with rights of survivorship or as tenants in common shall be divided equally between them."

Terry and Sherry each brought separate property into the marriage. Terry owned land in Morris County, various farm equipment, and two trucks and was indebted with several loans. Sherry owned real estate in Butler County, various livestock, and farm equipment, and she too had one outstanding loan.

After their wedding, Terry and Sherry maintained their separate farm properties but lived in Sherry's residence in Rose Hill. Two years later, Terry sold his Morris County real estate. With the proceeds from that sale, he purchased two properties in Marion County that had previously been owned by Terry's parents: a 5-acre residential tract, where Terry and Sherry would live throughout the remainder of the marriage, and the surrounding 155-acres of adjoining farmland.

There is no dispute that the money for the first transaction came from Terry's sale of his Morris County property (his separate property under the Antenuptial Agreement).

5

But the real estate purchase contract, the settlement statement, and—most importantly—the joint tenancy warranty deed for the 5-acre residence listed both Terry and Sherry as the buyers. The deed specifically indicated the owners of the property were "Terry A. Nelson and Sherry Nelson, husband and wife as JOINT TENANTS with rights of survivorship and not as tenants in common."

About a year after the purchase of the residential plot, the Nelsons acquired the 155 acres of adjoining land, again with money from the sale of Terry's former property. The contract of sale, settlement statement, and the joint tenancy general warranty deed all named Terry and Sherry as the buyers. The deed listed the property's new owners as "Terry A. Nelson and Sherry Nelson, husband and wife as JOINT TENANTS and not as tenants in common, with full rights of survivorship."

Over the next decade, the Nelsons made a variety of improvements and repairs to the land and the house in Marion County. They also mortgaged the Marion County residence; the mortgage note describes Terry and Sherry as the mortgagor "AS JOINT TENANTS AND NOT AS TENANTS IN COMMON, WITH FULL RIGHTS OF SURVIVORSHIP."

In 2015, Sherry petitioned for a decree of legal separation from Terry on grounds of incompatibility. The court issued a Decree of Divorce in October 2017 and later took up the question of property division. That question—particularly as it pertained to the properties in Marion County—proved to be a contentious affair, culminating in a four-day hearing with numerous witnesses.

Terry argued that the Marion County real estate should be considered his separate property under Sections 5 and 9(b) of the agreement because it had been purchased with money from his Morris County property—that is, it was his substitute separate property. Terry testified he did not *intend* for the Marion County properties to be jointly titled, and

the deeds created joint tenancies due to his ignorance, not the parties' intent. Sherry disagreed, contending Section 9(c) of the agreement, which deals with jointly titled property, controlled. Under that provision, she argued the Marion County properties were subject to equal division because the deeds were titled to herself and Terry in joint tenancy with rights of survivorship.

After the hearing, the district court issued a memorandum opinion dividing the former spouses' debts and assets. The court found that the Antenuptial Agreement was ambiguous as to how the Marion County properties should be divided, concluding Sections 5 and 9(c) conflicted as to whether those properties were separate or jointly owned. The court found that in order to determine which provision controlled, "it [was] necessary to determine whether [Terry] knowingly placed this land in joint tenancy."

The court then considered the witnesses' testimony and the other evidence presented. The court concluded that "Terry . . . did not place either of the two Marion County tracts of real estate into joint tenancy with Sherry . . . with the intent to convey ownership to her. This took place as a result of his own lack of knowledge and failure to recognize the significance of joint tenancy status." Put more simply, based on the testimony regarding Terry's intent, the court determined the property was substitute, separate property and was never meant to be jointly titled. Accordingly, the court ruled that the 160 acres of property in Marion County were Terry's separate property and "not subject to division as part of [the] divorce proceedings, pursuant to the Antenuptial Agreement." Sherry appeals.

## DISCUSSION

Under the Uniform Premarital Agreement Act, K.S.A. 2019 Supp. 23-2401 et seq., premarital agreements (also called prenuptial or antenuptial agreements) allow parties contemplating marriage to "contract with respect to . . . the disposition of property upon separation [or] marital dissolution." K.S.A. 2019 Supp. 23-2404(a)(3). Once a premarital

agreement is signed and the parties to the agreement become married, the agreement has the same effect as any other written contract. See K.S.A. 2019 Supp. 23-2405.

The interpretation and legal effect of a written contract are questions of law subject to unlimited review. *Einsel v. Einsel*, 304 Kan. 567, 579, 374 P.3d 612 (2016). The primary goal in interpreting any written instrument is to ascertain the parties' intent. When the language of a contract is unambiguous, the parties' intent must be ascertained from the four corners of the document—the contract itself—without applying additional rules of construction. See *Waste Connections of Kansas, Inc. v. Ritchie Corp.*, 296 Kan. 943, 963, 298 P.3d 250 (2013); *In re Murdock's Estate*, 213 Kan. 837, 845, 519 P.2d 108 (1974) ("Where an antenuptial contract is clear and unambiguous, . . . [the intention of the parties] must be determined from the four corners of the instrument itself without the aid of parol evidence.").

A contract is ambiguous if it cannot be carried out as written because conflicting language renders its meaning unclear. *Simon v. National Farmers Organization, Inc.*, 250 Kan. 676, Syl. ¶ 2, 829 P.2d 884 (1992). This occurs when a contract's text can reasonably support two or more interpretations. *Iron Mound, LLC v. Nueterra Healthcare Management, LLC*, 298 Kan. 412, 418, 313 P.3d 808 (2013); *Community First National Bank v. Nichols*, 56 Kan. App. 2d 1057, 1070, 443 P.3d 322 (2019). But courts should not strain to find an ambiguity where in common sense there is none. *Waste Connection of Kansas, Inc.*, 296 Kan. at 963; *American Family Mut. Ins. Co. v. Wilkins*, 285 Kan. 1054, 1059, 179 P.3d 1104 (2008). For this reason, contract terms cannot be read in isolation. Rather, we review the written document as a whole in order to give effect to the parties' intent. *Trear v. Chamberlain*, 308 Kan. 932, 936, 425 P.3d 297 (2018).

In its ruling, the district court found the Antenuptial Agreement was ambiguous as to how the Marion County properties—both purchased from the proceeds of Terry's separate property but jointly titled to Terry and Sherry—should be treated. In particular,

8

the court found Sections 5 and 9 conflicted as to whether the Marion County properties were substitute separate property (and thus not subject to division) or jointly held (and should be divided). Because the court found the agreement unclear, it turned to witnesses' testimony about how the parties intended the Marion County properties to be distributed. The court then ruled—despite the language in the written deeds—the parties had intended the Marion County properties to remain Terry's separate property. The court thus judicially reformed the two Marion County deeds to reflect its ruling.

Our discussion unravels these questions in the order the district court addressed them. Thus, we first consider the court's interpretation of the agreement and, informed by that interpretation, we turn to the court's treatment of the Marion County deeds.

1. *The Antenuptial Agreement is not ambiguous.*

In its original ruling on property division, the district court found that "two provisions of the Antenuptial Agreement"—Sections 5 and 9—"conflict" as to whether the Marion County properties were Terry's substitute separate property or were jointly owned by the former spouses. When Sherry asked the court to reconsider or clarify this statement, the court explained that it had "found ambiguity existed" in the agreement "and could therefore look at the parties['] intent" regarding how the property was meant to be distributed. Despite this finding of ambiguity, the court indicated that it believed "it followed the terms of the . . . agreement in [its] previous order despite the fact that the parties relied on conflicting terms in their arguments."

We pause before turning to the language of the agreement to discuss the legal effect of a finding—like the district court made here—that the text of a written agreement is ambiguous. As we have previously indicated, the aim of interpreting a written contract is to give effect to the parties' intent in entering into that agreement. *Prairie Land Elec. Co-op., Inc. v. Kansas Elec. Power Co-op., Inc.*, 299 Kan. 360, 366, 323 P.3d 1270

9

(2014). We presume that the results of all negotiations leading up to the contract are eventually written down and incorporated—or merged—into the written agreement. *Arensman v. Kitch*, 160 Kan. 783, 789, 165 P.2d 441 (1946). For this reason, "[w]hen a contract is complete, unambiguous, and free from uncertainty, parol evidence"—that is, testimony and evidence other than the written contract—"tending to vary the terms of the contract evidenced by the writing [are] inadmissible." *Simon v. National Farmers Organization, Inc.*, 250 Kan. 676, 679-80, 829 P.2d 884 (1992).

But when the parties' meaning is not clear from the text of an agreement, a court must still determine what the parties intended the contract to entail. In these circumstances, the parties' meaning is "ascertained by considering the language employed, the circumstances existing when the agreement was made, the object sought, and other circumstances tending to clarify the parties' real intentions." *Byers v. Snyder*, 44 Kan. App. 2d 380, 386, 237 P.3d 1258 (2010).

At all times, however, the court's focus must be what the parties intended *the agreement* to encompass. This point underscores the problem with the manner the issues were framed before the district court here. The court recognized that it was bound by the Nelsons' written Antenuptial Agreement. But even if that agreement were ambiguous (a conclusion we address later), the parties did not offer any evidence about their intentions to enter into their premarital contract. Rather, they presented evidence about a different issue—the acquisition of the Marion County properties and the parties' intent as to how the Marion County deeds should be titled.

We consider to the impact of this extracontractual evidence later in this opinion. But first, we must consider the text of the agreement itself. The district court found that two sections of the agreement conflicted with one another—Section 5, which defines separate property, and Section 9, which determines how various types of property will be divided in the event of a divorce.

10

Section 5 states that any property either spouse owned before the marriage would remain his or her separate property and—under Section 9(b)—would not be subject to division in the event of divorce. Section 5 indicates that each spouse will retain "sole dominion and control" over their separate properties, "including the right to assign, encumber, sell, deal with generally and dispose of by Deed . . . or otherwise." Section 5 also states that neither spouse will "by reason of the contemplated marriage" acquire "any interest" in his or her spouse's separate property, including "any substitute or additional properties acquired with and from the proceeds resulting from the sale of . . . [those separate] propert[ies]."

Terry argues that Section 5 is ambiguous as to the Marion County properties because it does not anticipate a way for a separate property to become jointly titled or part of the marital estate. But Terry reads this provision too narrowly. The agreement does not demand that each spouse's separate property always remain separate property. In fact, Section 5 states that either spouse may transfer his or her separate property in any manner he or she wishes. Instead, the agreement indicates that property previously owned by either spouse would not be converted to marital property by operation of law when the marriage took place. Thus, nothing in Section 5 prevented Terry from selling his separate property, buying another property with proceeds from the previous sale, and titling the new property in any manner he chose—including in joint tenancy with his wife.

Terry's reliance on the "Waiver of rights" in Section 11 of the agreement is similarly misplaced. That section describes the rights of a surviving spouse upon the death of another, stating the surviving spouse would not—by operation of law—become the owner of the decedent's separate property. This provision has no effect on a person's ability to transfer separate property in any way he or she chooses while alive. In fact, Section 11 agrees that neither spouse's will would "prevent either party from transferring to the other party during the marriage any of the sole and Separate Property owned by

11

him or her." Contrary to Terry's arguments on appeal, these provisions can be read in harmony with Section 5 and are not ambiguous.

Nor does Section 5 conflict with the agreement's property-division provisions in Section 9. Section 9 does not restrict the parties' ability to create jointly titled property. It simply states that, in the event of a divorce, any property that is titled to both Terry and Sherry in joint tenancy or as tenants in common will be divided equally between them, while any separate property as defined in Section 5 will not.

The district court appears to have perceived a conflict between Sections 5 and 9 because the Marion County properties, though jointly titled, were purchased with the proceeds from the sale of Terry's separate property. But these facts have no effect on whether the agreement's language is ambiguous or conflicting. When the agreement is read as a whole, Sections 5 and 9 do not conflict with one another.

Indeed, our review of the court's reasoning shows it did not actually find the agreement ambiguous. The court found that the Marion County real estate was Terry's separate property not because of any language in the agreement, but because the land was purchased with proceeds from the sale of Terry's Morris County property. The "conflict" the court found arose from the fact the Marion County deeds were held in joint tenancy with Sherry. In other words, the court understood that the agreement required property held in joint tenancy to be evenly split at divorce, and it understood that the deeds were titled in joint tenancy—the court indicated that its ruling "followed the terms" of the agreement. The court's difficulty arose because Terry claimed he *intended* the Marion County properties to be titled differently than they were.

But the written deeds, executed years after the Nelsons were married, do not render the Antenuptial Agreement ambiguous. Rather, the agreement can be—and should have been—enforced as written, with separate property remaining outside the scope of

12

property division during the divorce and jointly titled property being split equally between former spouses. The district court erred when it stated otherwise in its ruling.

2. *The district court erred when it considered parol evidence to impeach the unambiguous language of the Marion County deeds.*

As our previous discussion illustrates, the "ambiguity" found by the district court arose not out of the parties' agreement, but from a conflict between the text of the Marion County deeds and the witnesses' testimony. To resolve this question, the court "believe[d] it [was] necessary to determine whether [Terry] *knowingly* placed this land in joint tenancy." (Emphasis added.) After four days of testimony, the court found that Terry "did not place either of the two Marion County tracts of real estate into joint tenancy with Sherry . . . with the intent to convey ownership to her." And the court found Terry signed the written deeds "out of ignorance."

It is a general principle of Kansas law that oral testimony "cannot be used to vary the terms of a written instrument." *In re Estate of Moore*, 53 Kan. App. 2d 667, 672, 390 P.3d 551 (2017), *aff'd* 310 Kan. 557, 448 P.3d 425 (2019). This principle, which courts call the parol-evidence rule, is "not a rule of evidence but of substantive law whose applicability is for the court to determine." 53 Kan. App. 2d at 672; see *Phipps v. Union Stock Yards National Bank*, 140 Kan. 193, 197, 34 P.2d 561 (1934). Thus, no contemporaneous objection is required to preserve a question regarding the admissibility of parol evidence for appellate review. *In re Estate of Moore*, 53 Kan. App. 2d at 672.

Though implicated when interpreting any written document, the parol-evidence rule is particularly important when it comes to property deeds. In Kansas, any contract for the sale of land and any interest in land must be in writing. See K.S.A. 33-106 (statute of frauds). Written deeds are publicly recorded, placing the world on notice of the owner's (or owners') interest in the real estate. See *Miller v. Miller*, 91 Kan. 1, 6-8, 136 P. 953

13

(1913). Our system of land ownership and transfer hinges on people's ability to rely on these written records.

For this reason, courts have long recognized that "parol evidence is inadmissible to contradict, vary, change, or restrict the terms of a valid deed." *Brown v. Parmalee*, 130 Kan. 165, 175-76, 285 P. 563 (1930). The only exceptions to this rule are instances of fraud or mutual mistake. *Winsor v. Powell*, 209 Kan. 292, 299, 497 P.2d 292 (1972).

Neither party in this case argued that the Marion County deeds were fraudulent. And the parties' conflicting testimony underscored that those deeds were not the result of any mutual mistake. Under these circumstances, when a deed indicates—as the Marion County deeds do here—that property is owned by "joint tenants with right of survivorship," courts must give effect to that intention. "[P]arol evidence is not admissible to explain or vary the terms of the instrument[s]." 209 Kan. at 299.

If Terry had intended the Marion County real estate to be his own separate, substitute property—as he testified—he could have titled it in a manner reflecting that choice. But the deeds indicate otherwise. Consequently, the district court erred in considering extrinsic evidence of Terry's intent and knowledge about how he intended the Marion County properties to be owned. The only evidence the court could consider were the deeds themselves, which unambiguously stated the properties were owned by Terry and Sherry as joint tenants with rights of survivorship.

This result may seem harsh, particularly given the court's findings regarding the various witnesses' credibility. But if courts were allowed to question parties' intent in executing deeds, despite the language of those recorded documents, whenever a person disputed land ownership, the goals of certainty and notice in real-estate transactions would be thrown into chaos. Written deeds would have little, if any, meaning. There

would be no way for a potential purchaser of land to know who owned that property and to what extent.

Fortunately, that is not the world in which we live. Thus, the Marion County deeds must be enforced as written—conveying ownership of the Marion County properties to Terry and Sherry as joint tenants with rights of survivorship. Under Section 9(c) of the agreement, those properties must be divided evenly between the parties upon their divorce. We therefore reverse the district court's judgment to the contrary and remand the case with directions that the court divide the Marion County properties between the parties under the portions of the agreement governing jointly held property.

3. *We deny Sherry's request for attorney fees.*

In her final claim on appeal, Sherry asks this court to order Terry to pay her attorney fees incurred during the proceedings before the district court and on appeal. A Kansas court cannot "award attorney fees unless a statute authorizes the award or there is an agreement between the parties allowing attorney fees." *Snider v. American Family Mut. Ins. Co.*, 297 Kan. 157, 162, 298 P.3d 1120 (2013). Appellate courts may award attorney fees "for services on appeal in cases where the district court had authority to award attorney fees." *Hodges v. Johnson*, 288 Kan. 56, 74, 199 P.3d 1251 (2009).

District courts have broad discretion under K.S.A. 2019 Supp. 23-2715 to award attorney fees to either party in a divorce case "as justice and equity require." But parties to a premarital agreement can limit the courts' equitable discretion on any matter, including attorney fees, as long as their agreement does not violate public policy. K.S.A. 2019 Supp. 23-2404(a)(8). The Nelsons chose to include two provisions in their Antenuptial Agreement governing their rights to an award of attorney fees in the event of a divorce. Thus, those provisions—and not K.S.A. 2019 Supp. 23-2715—govern our consideration of this issue.

15

First, Section 9(f) states generally that, in the event of a divorce, "[n]either party shall claim any amount for attorney fees." Second, Section 18 contains an indemnification provision, which states:

"Each party shall refrain from attempting to obtain any court order or decision which is contrary to the terms of this Agreement or which attempts to enlarge or reduce the amounts to be received by either party in the event of a divorce . . . . Each party hereby indemnifies the other for any loss, cost or expense (including attorney fees) the other party incurs for his/her breach in seeking to obtain judicial modification of this Agreement. This indemnification on behalf of each party shall be binding upon and include any claims, demands, or litigation filed."

Sherry's argument rests solely on this indemnification provision. She contends that Terry's attempt "to bar [her] from her share of the parties' 160 acres of real estate in Marion County" is contrary to the agreement and therefore entitles her to indemnification. But we disagree. Our review of the record shows that Terry did not seek to modify the agreement; he argued that the Marion County properties should be considered separate, not jointly held, property. The indemnification provision is thus inapplicable.

Instead, we are bound by the parties' unambiguous intent, stated in Section 9(f): "Neither party shall claim any amount for attorney fees." We therefore deny Sherry's request for attorney fees for the proceedings before the district court, as well as her motion for attorney fees on appeal.

Reversed and remanded with directions.