NOT DESIGNATED FOR PUBLICATION

No. 124,040

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

In the Matter of the Marriage of
R. ELIZABETH BOWERS,
*Appellee*,

and

TEDD A. POTTS,
*Appellant*.

MEMORANDUM OPINION

Appeal from Johnson District Court; PAUL C. GURNEY, judge. Opinion filed February 10, 2023.
Affirmed.

*Allison G. Kort*, of Kort Law Firm LLC, of Kansas City, Missouri, for appellant.

*R. Elizabeth Bowers*, appellee pro se.

Before HURST, P.J., BRUNS and GARDNER, JJ.

HURST, J.:  This appeal results from a lengthy path to divorce. Tedd A. Potts and R. Elizabeth Bowers were married in March 2008, and Bowers filed for divorce in May 2016. After extensive litigation, the district court filed its amended journal entry and decree of divorce on March 16, 2020, entering a $417,093 judgment against Potts to be paid to Bowers within five years. Potts appealed, asserting that the district court erred in interpreting the parties' premarital agreement and seeking reversal and issuance of a new

judgment consistent with his interpretation of the premarital agreement. Having found no error, this court affirms the district court's judgment.

FACTUAL AND PROCEDURAL BACKGROUND

After about an eight-year marriage beginning on March 6, 2008, that was governed by numerous contractual agreements at issue here, Bowers petitioned for divorce on May 23, 2016. The parties had a two-day trial in December 2018 and were divorced on December 23, 2019, in Johnson County, Kansas. After addressing numerous motions and filings by the parties, the district court entered its final judgment against Potts for $417,093 to be paid to Bowers within five years.

Potts timely appealed the judgment, challenging the district court's interpretation of the parties' premarital agreement and its determination that Potts owed Bowers money for breaching various postnuptial agreements. The parties executed multiple agreements relevant to this appeal, including a premarital agreement and several postnuptial agreements governing an investment account, a loan for household expenses, and a loan for a golf membership. The content and obligations of these various contracts are important to this court's decision and must be described in detail herein.

1. *The Premarital Agreement*

The parties executed their premarital agreement—which they both stipulated was valid and enforceable as written—the day before their Las Vegas wedding. The premarital agreement, in relevant part, provides:

"WHEREAS, the parties hereto intend to be married on March 6, 2008, in Las Vegas, Nevada, and thereafter reside in the State of Kansas, and each of the parties owns property, the nature and extent of which has been fully disclosed to the other; and the

2

assets and liabilities of each of the parties have approximate values as shown on **Schedule A** and **Schedule B** attached hereto and made a part hereof, respectively . . . .

. . . .

"WHEREAS, the parties desire that all 'Separate Property' (as hereinafter defined) owned by either party at any time shall remain the separate property of each of them, and after the marriage be subject to the sole ownership, control, use and enjoyment of its owner, free from any claim of the other party by reason of the marriage or otherwise; and in the event the marriage is terminated other than by death, except as expressly provided herein, all Separate Property shall be free from the claims of alimony, division of property, community property, maintenance, and support for himself or herself, attorney fees, and any expenses of litigation of any kind . . . and each of the parties shall be free to dispose of, by will or otherwise, his or her Separate Property and estate to whomever he or she so desires without the other making any claim against the estate of the other that would arise as a legal right by reason of the marriage . . . .

. . . .

"1.      Separate Property. Each of the parties agrees that, for purposes of this Agreement, the term **'Separate Property'** of each party shall include the following property:

"(a)      All real property and personal property, or interests therein, owned by such party before and at the time of the marriage, including, without limitation . . . any and all other property, assets or estates owned by such party before and at the time of the marriage, including, without limitation, the property of such party set forth on **Schedule A** and **Schedule B** . . . and

"(b)      All real and personal property, or interests therein, acquired, contributed or received by such party during the marriage, including, without limitation . . . and all other property, assets or estates purchases, acquired, contributed or received in any manner by such party during the marriage; and

3

"(c)     All income, rents, profits, dividends, appreciation and increases arising from or accruing to the items described in subparagraphs (a) and (b) . . . and

"(d)     All proceeds from the sale of the items described in subparagraphs (a) and (b) . . . including property obtained in exchange for said property or any interest therein and all assets into which such property is reinvested; and

"(e)     Any and all compensation of any nature and kind received or earned by such party for personal services rendered, including, but not limited to, salary, bonuses, commissions, stock, stock options, life insurance, contributions to profit sharing plans, contributions to pension or other retirement plans, and any other remuneration or benefit received, or receivable, by that party as a result of that party's employment or personal services rendered, regardless of when earned, paid or received; (ii) and all other income received or earned by that party from any source including, but not limited to, Social Security, pensions, other retirement benefits, annuities, medical benefits payments, disability benefit payments and all other amounts or benefits received by that party from any source whatsoever, regardless of when paid or received; and (iii) all income, rents, profits, dividends, appreciation and increases arising from or accruing to such compensation, remuneration or benefit, all property acquired in exchange therefore or from the sale of such compensation, remuneration or benefit, and all assets into which such compensation, remuneration or benefit or any interest therein is reinvested; and

"(f)     All property acquired by gift, bequest, devise or descent, either prior to or during the marriage, all income, rents, profits, dividends, appreciation and increases arising from or accruing to such property, all property acquired in exchange therefore or from the sale of such property or any interest therein, and all assets into which such property is reinvested; and

"(g)     All tangible personal property not having an ownership certificate or other document of title which is owned by a party prior to the

4

marriage and such tangible personal property not having an ownership certificate or other document of title which is received at any time by such party which has been in the possession of that party's family for more than one generation, which may include, without limitation, jewelry, china, linens, silverware, crystal, artwork or other collectibles, photographs or other memorabilia ('**Family Heirlooms**'), and any tangible personal property not having an ownership certificate or other document of title which is listed on **Schedule A** or **Schedule B** to this Agreement and designated as Separate Property of Tedd or Beth, respectively.

"(h)    All property of either party not considered Joint Property, as defined below in Paragraph 2 of this Agreement.

"2.    Joint Property. Each of the parties agrees that (i) any property which is titled in their joint names as tenants by the entirety, as joint tenants with the right of survivorship, or as tenants in common, and (ii) any tangible personal property having no formal ownership designation that is acquired by the parties during their marriage for their joint use and enjoyment, shall be considered **'Joint Property'** for purposes of this Agreement.

"3.    Disposal of Separate Property. Each of the parties agrees that during the marriage, each of them shall be completely independent of the other regarding enjoyment or disposal of his or her own Separate Property. Each of the parties expressly waives any claim he or she may have by reason of the marriage or otherwise to the Separate Property of the other party.

. . . .

"6.    Termination of the Marriage Other than by Death. Except as expressly provided herein, in the event the marriage is terminated other than by death, including, without limitation, by divorce, dissolution, annulment or legal separation, each of the parties agrees as follows:

"(a)     Each of the parties agrees that the Separate Property of the other party shall be free from the claims of alimony, community property, division of property, temporary or permanent maintenance and support for himself or herself, attorney fees, and expenses of litigation of any kind;

"(b)     Each of the parties expressly waives any claims for alimony, community property, division of property, temporary or permanent maintenance and support for himself or herself, attorneys fees and any expenses of litigation of any kind, under laws now or hereafter in effect in any country, state or other jurisdiction, from the other party from any source, including, without limitation, from any future earnings and income or other after-acquired property or rights of the other.

"(c)     Each of the parties agrees that they will make a division and disposition of all Joint Property, as they shall then agree, or if they are unable to agree on such division and distribution of Joint Property, then said Joint Property shall be divided in a manner equal in value between said parties.

"(d)     Each of the parties hereby irrevocably waives any and all rights under any community property laws, regardless of whether applicable to Separate Property or any Joint Property and whether applying now or hereinafter applying in the future. In the event of any action for annulment, divorce, dissolution of marriage, or similar claim or action shall be instituted by either of the parties against the other in a jurisdiction other than the State of Kansas, both parties agree that, except as otherwise provided in this Agreement, each of them does hereby forever waive any and all rights that the laws of that jurisdiction shall grant to them, whether such jurisdiction is a state which permits equitable distribution of marital property or not, whether such state recognizes the concept of community property, and whether the laws of any such state are similar or dissimilar with the laws of the State of Kansas.

"(e)     In the event that the law of Kansas or such other jurisdiction holds invalid any waiver of any rights under this Agreement, including, without limitation, spousal support, or if either party hereto successfully obtains spousal

6

maintenance or support, alimony, alimony pendente lite, etc., from the other party, in Kansas, or otherwise, or if either party successfully obtains ownership or other rights in and to the Separate Property of the other party, the party obtaining economic relief agrees to fully indemnify and hold harmless the other party, dollar for dollar, for the value of any Separate Property awarded to such party or for any amount that must be paid in spousal maintenance or support, alimony pendente lite, permanent alimony, and the like, other than as specifically set forth in this Agreement. Notwithstanding any other term or provision of this Agreement, it is the express intention of the parties hereto that any court of law give full force and effect to the terms and provisions set forth in this Agreement.

"Notwithstanding the foregoing, each party expressly agrees that in the event of the termination of the marriage by divorce, dissolution, annulment or legal separation, Beth shall receive, from Tedd's Separate Property, the sum of Fifty Thousand Dollars ($50,000) and also Fifty Thousand Dollars ($50,000) for each completed year of marriage, calculated by using the anniversary date of the marriage. There shall be no proration for a partial year."

2. *The Postnuptial Agreements*

After their marriage, the parties entered into multiple postnuptial agreements, three of which are relevant to Potts' claims on appeal:

(1) an agreement regarding Potts' management of Bowers' Interactive Brokers (IB) financial account;

(2) an agreement that Bowers would loan Potts $20,000 for household expenses; and

(3) an agreement that Bowers would loan Potts $10,176 for his West Bay golf membership.

a.  *Agreements Regarding Management of Bowers' IB Account*

Shortly before their nuptials, the parties entered into a written agreement on December 10, 2007, requiring Potts to "trade (an) account without direction from [Bowers] . . . for the benefit or liability of [Bowers]." For ease, this 2007 postnuptial agreement will be referred to throughout this opinion as the 2007 IB Agreement. The IB account was initially funded through three deposits by Bowers that totaled $80,000. The 2007 IB Agreement did not require Potts to provide a guaranteed or minimum rate of return, nor did it provide that Potts would receive financial compensation or any remuneration for his management of the IB account. The 2007 IB Agreement stated that Bowers would hold Potts harmless for any losses or diminished returns resulting from his management of the IB account. The agreement required Potts to invest 30 percent of the account's assets in bond funds, unless otherwise agreed in writing.

After a few years of Potts' management of the IB account, the parties entered into another written agreement on March 30, 2011—referred to as the Second IB Agreement—significantly altering the terms of the 2007 IB Agreement to add safeguards against Bowers suffering certain losses. The Second IB Agreement guaranteed that Potts' management would not permit Bowers' IB account to drop below $200,000 and guaranteed that Potts would generate at least $4,000 in profits and a 6 percent annual return on investment. It also added a stop-loss provision "to limit any drawdown in [Bowers'] portion of the account to $100,000, at which point [Bowers'] positions will be liquidated and her money will be wired to her bank account." It also permitted Potts to, "from time to time," transfer 50 percent of any excess profits out of the account for his management services. Therefore, if Potts' management resulted in profits in excess of the guaranteed minimums, he would financially benefit.

Just five months later, on August 16, 2011, the parties executed a third agreement—referred to as the Third IB Agreement—again changing the terms of Potts'

management of the IB account. The Third IB Agreement removed any guarantees that prevented the IB account from dropping below $200,000 and also removed the guarantees requiring that Potts generate a minimum rate of return. In addition, the Third IB Agreement removed the provision that allowed Potts to take up to half the excess profits on the account for his management services. However, the $100,000 stop-loss provision remained in the Third IB Agreement, which required that, in the event Bowers' position in the account was reduced to $100,000, the remaining balance would be liquidated and wired to Bowers.

On September 1, 2011, the $100,000 stop-loss provision was triggered. Potts informed Bowers that the stop-loss provision had been triggered and that—with the exception of one stock that was under a trading halt—all other positions in the account were closed and liquidated. At the time the stop-loss provision was triggered, the account balance was just under $671,000. Instead of wiring the balance to Bowers' bank account, Bowers instructed Potts to leave the balance in the IB account where the funds would be secure. The district court determined, after some dispute between the parties, that Bowers not only left the money in her IB account, but instructed Potts to continue trading on her IB account for roughly three more years after the stop-loss provision had been triggered. This continued trading resulted in significant losses. On January 30, 2015, Bowers instructed Potts to liquidate her IB account and, on February 19, 2015, the remaining $19,000 balance in the IB account was transferred to Bowers' bank account.

b. *The July 2015 Household Loan and Promissory Note*

Potts and Bowers also entered into agreements regarding household expenses. On July 31, 2015, the parties initialed the "Final Plan & Agreement" for a promissory note requiring Potts to repay Bowers for a $20,000 loan, which will be referred to as the 2015 Household Promissory Note throughout the rest of this opinion. Bowers had loaned Potts $20,000 to cover his portion of household expenses that Potts claimed he could not cover

9

at the time. The 2015 Household Promissory Note provided that Potts would make $372.86 monthly payments to Bowers starting August 1, 2016. At trial, Bowers said that Potts never made any payments toward the 2015 Household Promissory Note and the parties never rolled the outstanding balance into any other promissory note. After hearing all the evidence, the district court determined that, including penalties and interest, Bowers owed Potts $23,313.73.

c. *The December 2015 Golf Membership Loan and April 2016 Loan*

The parties entered into several other agreements whereby Bowers loaned Potts money that he agreed to repay. First, on December 27, 2015, Bowers agreed to loan Potts $10,176 to pay for his 2016 West Bay golf membership, and Potts agreed to pay Bowers back from the sale of exercise equipment and collectible wine, with any remaining balance to be paid off at $300 per month with no interest. Bowers issued a check for $10,176 to Potts the following day.

Second, on April 10, 2016, Bowers agreed to loan Potts $10,000 by depositing those funds into their joint checking account, and Potts agreed that Bowers could reimburse herself for that $10,000 loan out of his future commission checks.

d. *The May 2016 Consolidated Promissory Note*

On May 22, 2016, the parties entered into the May 2016 Consolidated Promissory Note—consolidating the total balances Potts owed Bowers from the December 2015 golf membership loan and the April 2016 $10,000 bank account transfer—for a new total of $12,255. The May 2016 Consolidated Promissory Note agreement referenced both the December 2015 and April 2016 loans and payments that had been made on each of those obligations. Potts made no payments on the May 2016 Consolidated Promissory Note.

3. *District Court Proceedings, Trial, and Orders*

Bowers filed a petition for divorce in May 2016 and sought enforcement of the various premarital and postnuptial agreements. The parties spent the next five years litigating the divorce, which included numerous motions and filings.

Relevant here is Potts' motion for summary judgment on Bowers' claim that he should be ordered to pay $500,000 to her under the terms of the premarital agreement. During the hearing on Potts' summary judgment motion, the parties agreed that, based on the length of their marriage, under the terms of the premarital agreement Bowers should receive $500,000 from Potts' Separate Property, which was defined in the premarital agreement. However, Potts argued that he should not have to pay the full $500,000 because he did not have that much in his Separate Property at that time. Potts sought to cap the amount owed to the total value of his Separate Property—which he claimed was $300,000—and that payment of that amount should satisfy the provision of their premarital agreement at issue. Unsurprisingly, Bowers disagreed and argued that if Potts' current Separate Property was not sufficient to satisfy the $500,000 obligation, then Potts' future Separate Property should be used to satisfy any remaining obligation.

To the disappointment of Potts, the district court agreed with Bowers. It provided a thorough, 10-page analysis of the parties' premarital agreement and found that it did not limit the source of payment for Potts' $500,000 obligation to his *current* Separate Property, but rather allowed Bowers to recover from Potts' *future* Separate Property, including any property that started as joint property but became his Separate Property after it had been assigned to Potts through the divorce process.

After the parties' two-day trial in December 2018, where both Bowers and Potts testified, the district court issued its initial journal entry and decree of divorce with orders of property division on December 23, 2019. Thereafter, the district court issued its

amended journal entry and decree of divorce with orders of property division on March 16, 2020, correcting the outstanding balance owed on the 2015 Household Promissory Note. The court's order listed various general findings, including:

"The [premarital agreement] also provides that upon the termination of the marriage by divorce, Mr. Potts must pay to Ms. Bowers the sum of $50,000 for each year of marriage with an additional $50,000 for the first year of marriage. The parties agreed to cap the amount at $500,000. The Court has previously ruled on claims made by the parties relating to this obligation, finding that '[i]f the value of [Potts'] current 'Separate Property' is insufficient to fully satisfy the $500,000 obligation, [Potts] will be subject to a judgment in favor of [Bowers] for the amount of any shortfall, and [Bowers] may recover from [Potts'] future 'Separate Property', including property after it has been assigned to [Potts] from the parties' 'Joint Property.'"

In the division of assets and liabilities section of the order, the court made findings under the statutory factors set out in K.S.A. 2019 Supp. 23-2802 to govern the division of property that was not controlled by the parties' premarital agreement or various postnuptial agreements. The court also made findings about each of the parties' postnuptial agreements and specifically explained its findings about the agreements governing Potts' management of Bowers' IB account:

"Mr. Potts' conduct with respect to the management of [Bowers' IB account] resulted in a dissipation in a total amount of $152,431. This includes a loss of $40,431 for failing to adhere to the 30% investments in bond funds under the December 10, 2007 Agreement, and $22,000 in losses sustained for failing to close the account in a timely manner when requested, when the account held $41,000, before it was reduced to approximately $19,000, and $90,000 for failing to keep Ms. Bowers apprised of the account declines, whereby she lost the opportunity to act upon available information to limit a further decline in the account. The Court will consider the dissipated amount when determining a final distribution of assets assigned to the parties."

The court then ordered the following financial judgment against Potts in favor of Bowers:

| | |
|---|---|
| "$152,431 | Dissipation of [Bowers' IB account] |
| "$69,147 | Bedlam outstanding obligation |
| "$23,314 | Promissory note balance [July 2015 household loan] |
| "$12,255 | Consolidated note/loan balance [May 2016 Consolidated Note] |
| "$10,000 | Golf club apportionment |
| "$500,000 | Premarital Agreement Amount Due |
| | |
| **"$767,147** | **Total Due before application of credits** |
| | |
| "($247,054) | Credit on Florida Condo |
| "($38,000) | Credit on two vehicles |
| "($65,000) | Collectibles, art, furniture and wine |
| | |
| **"$417,093** | **Balance on judgment remaining after application of credits"** |

The court ordered Potts to pay Bowers the $417,093 in monthly installments beginning on April 1, 2020, with payment to be complete in five years. Potts appealed, and Bowers then filed a pro se emergency motion to enforce judge's orders and for sanctions, alleging Potts failed to vacate their Florida condo and also failed to comply with the court's orders regarding payment of the judgment. The district court granted Bowers' motion, sanctioning Potts $31,350 for continuing to occupy the Florida condo and an additional $300 per day until Potts vacated the premises. The court also found that Potts had failed to make any of his monthly installment payments toward the judgment against him, so the court instructed Potts that "the entire judgment along with statutory post-judgment interest is now due." This appeal follows.

DISCUSSION

Potts challenges the district court's judgment in two general areas. First, he objects to the district court's order that he pay Bowers $500,000 pursuant to the premarital agreement. Second, he objects to the district court's determination that he breached several of the postnuptial agreements resulting in $188,000 owed to Bowers before offsets.

1. *The district court did not err in its division of the property by ordering Potts to pay Bowers $500,000.*

Potts generally objects to the district court's determination that his $500,000 obligation to Bowers was not limited by the value of his then-current Separate Property. Specifically, he alleges that the district court erred in

(1) its interpretation of the term "Separate Property" in the premarital agreement; and

(2) its application of K.S.A. 2019 Supp. 23-2802(c) to certain property.

As an initial matter, this court must determine if Potts' objections to the district court's property division are preserved for appeal. Generally, issues not raised before the district court cannot be raised on appeal. *Gannon v. State*, 303 Kan. 682, 733, 368 P.3d 1024 (2016). To demonstrate the issue is preserved, the objecting party is required to cite a pinpoint reference to the location in the record where the issue was raised before the district court. Kansas Supreme Court Rule 6.02(a)(5) (2022 Kan. S. Ct. R. at 36). Contrary to Bowers' assertion, Potts sufficiently raised these issues before the district court. Potts argued in his failed summary judgment motion that payment from his Separate Property should be limited to the Separate Property that existed at the time of the parties' divorce. The district court incorporated Potts' summary judgment argument into its findings in the amended journal entry and decree of divorce with orders of

14

property division. Then Potts' notice of appeal challenged "all Orders and Judgments entered by the District Court." Therefore, Potts preserved this issue for appellate review and provided sufficient reference to its preservation.

*Standard of Review*

Having found these two issues preserved, this court must determine the appropriate standard of review. Valid premarital agreements are a type of contract and thus subject to the same "rules of law applicable to other contracts." See *Drummond v. Drummond*, 209 Kan. 86, 91, 495 P.2d 994 (1972). Challenges to contract interpretation are a matter of law subject to this court's unlimited review. *Einsel v. Einsel*, 304 Kan. 567, 579, 374 P.3d 612 (2016). This court's first goal in interpreting any written contractual instrument is to determine and ensure the parties' intent. If the language of a contract is unambiguous, the parties' intent is determined from the four corners of the contract itself, without applying additional rules of construction. *In re Estate of Murdock*, 213 Kan. 837, 845, 519 P.2d 108 (1974) ("Where an antenuptial contract is clear and unambiguous . . . [the intent of the parties] must be determined from the four corners of the instrument itself without the aid of parol evidence."); *In re Marriage of Nelson*, 58 Kan. App. 2d 920, 925, 475 P.3d 1284 (2020).

Contracts are ambiguous only if they cannot be enforced as written because conflicting language leaves the contract's meaning unclear, like when the contract language could reasonably support two or more interpretations. However, "courts should not strain to find an ambiguity where in common sense there is none." *Nelson*, 58 Kan. App. 2d at 925. To give effect to the parties' intent, this court reviews the written document as a whole—rather than interpreting terms in isolation. 58 Kan. App. 2d at 925. Any mistake of law in interpreting a contract constitutes an abuse of the district court's discretion. *Einsel*, 304 Kan. at 579.

*The district court did not err in its interpretation of the term "Separate Property" in the premarital agreement.*

Potts asserts that the district court abused its discretion by "adding non-existent language" into the premarital agreement and disregarding the parties' explicit and unambiguous definition of "Separate Property." The premarital agreement defined "Separate Property" as including, among other things, "[a]ll real and personal property, or interests therein, owned by such party before and at the time of the marriage." Potts argues that inclusion of the clause "before and at the time of marriage" restricts the definition of "Separate Property" to only Potts' Separate Property in his possession at the time of divorce. But this court does not interpret this provision just by reading this single definition in isolation; rather, this court reviews the contract as a whole to determine the parties' intent. *Nelson*, 58 Kan. App. 2d at 925. And this court will not read words into a contract which import an intent wholly unexpressed when it was executed. *Quenzer v. Quenzer*, 225 Kan. 83, 85, 587 P.2d 880 (1978).

Importantly, the parties' premarital agreement does not explicitly limit the definition of "Separate Property" to separate property currently in the possession of the parties at a specific point in time. If that was the parties' intent, the definition could have easily been written to accomplish that intent. Additionally, when reviewing the definition of "Separate Property," it is important to consider the entire agreement—particularly the other subsections that form the definition of "Separate Property." When the district court reviewed the entire provision related to "Separate Property," it found:

"The Agreement identifies some of the parties' 'Separate Property' as property acquired before or during the marriage (See subparagraphs 1 [a], [b] and [f]). However, the Agreement does not limit 'Separate Property' exclusively to these two time frames.

"Subparagraph 1(e) defines 'Separate Property' as 'any and all compensation of any nature and kind received or earned by such party . . . including, but not limited to, salary, bonuses, commissions, stock, stock options, . . .' [Potts] points to the use of the

16

terms 'received or earned', as past tense verbs, in an effort to avoid future earnings as a source from which to satisfy [his] obligation. [Potts] argues that under this subparagraph, compensation has to have already been received, already earned, or receivable, and any future earnings—those not yet 'earned' or not now 'receivable' may not be a source for satisfaction of the $50,000/year obligation.

"The Court notes that subparagraph 1(e) contains no express language, limiting the period during which the provision would apply, to before or during the marriage. In addition, the terms 'earned' and 'received' do not establish a limiting time frame. Had the parties intended to limit the source of funds to past earned income, they could have included a qualifying adverb, such as 'already.' Had they done so, [Potts'] argument could have merit. The same would be true if the parties had expressly limited the source of 'Tedd's Separate Property' as not including future earnings. However, again, the parties included no such limitation. Rather, they expressly rejected any limited time period for what earnings could be utilized, by including specific language in subparagraph 1(e) which referenced earnings **'regardless of when earned, paid or received'** (emphasis added). No limitation was provided on amounts earned, paid or received in the future."

The court also noted that subparagraph 1(h) of the premarital agreement contains a catch-all definition of "Separate Property":  "All property of either party not considered Joint Property, as defined below in Paragraph 2 of this Agreement." Important to this catch-all definition, the premarital agreement defines "joint property" as

"(i) any property which is titled in their joint names as tenants by the entirety, as joint tenants with the right of survivorship, or as tenants in common, and (ii) any tangible personal property having no formal ownership designation that is acquired by the parties during their marriage for their joint use and enjoyment. . . ."

The district court found that future earnings or property acquired by Potts following the parties' divorce would "clearly not be considered 'Joint Property' either under any common sense interpretation of the term, or from a reading of subparagraph 1(h) and paragraph 2 of the Premarital Agreement. Under either analysis, [Potts'] future earnings or future acquired property would be considered to be his 'Separate Property.'"

17

The district court found, and this court agrees, that the language of the premarital agreement defining "Separate Property" is unambiguous, and its application does not result in an unworkable or unenforceable agreement. A clear, simple, common sense reading of the premarital agreement demonstrates that the parties intended to protect their individual, separate property. This protection was not limited to property owned at any particular point in time, but included all separately owned property regardless of its acquisition date. To find otherwise would require this court to pervert the unambiguous language of the agreement and, by extension, the clear intent to not allow the parties to infringe upon each other's property.

The parties' intent is evidenced by a reading of the entire premarital agreement, including the sixth "WHEREAS" clause of the premarital agreement, which states that "the parties desire that all 'Separate Property' . . . owned by either party *at any time* shall remain the separate property of each of them." (Emphasis added.) Moreover, the language of the section establishing Potts' $500,000 obligation to Bowers reads:

> "*Notwithstanding the foregoing*, each party expressly agrees that in the event of the termination of the marriage by divorce, dissolution, annulment or legal separation, Beth shall receive, from Tedd's Separate Property, the sum of Fifty Thousand Dollars ($50,000) and also Fifty Thousand Dollars ($50,000) for each completed year of marriage, calculated by using the anniversary date of the marriage. There shall be no proration for a partial year." (Emphasis added.)

Nothing in this provision provides for a reduction in the amount owed in the event that Potts' then-owned Separate Property was less than that amount. It also does not provide for proration for partial years, evidencing an intent to not prorate the amount for any reason.

The unambiguous language of the premarital agreement clearly intends to protect *all* of the parties' separately owned/earned property from division in the divorce

18

proceedings—both current and future. Reviewing the premarital agreement as a whole, this court finds the parties did not intend to limit Potts' $50,000 per year obligation by the amount or value of his Separate Property at the time of divorce.

*The district court did not err in applying K.S.A. 2019 Supp. 23-2802(c) to the premarital agreement.*

Potts also claims that the district court erred by applying K.S.A. 2019 Supp. 23-2802(c)—the statute governing property division in divorce proceedings—to divide property governed by the parties' premarital agreement. Potts argues that the district court ignored the spousal maintenance waiver in the premarital agreement and "substituted its own intent for the parties" by utilizing K.S.A. 2019 Supp. 23-2802(c). K.S.A. 2019 Supp. 23-2802(c) provides that when the court divides property in a divorce proceeding, it shall consider:

"(1) The age of the parties; (2) the duration of the marriage; (3) the property owned by the parties; (4) their present and future earning capacities; (5) the time, source and manner of acquisition of property; (6) family ties and obligations; (7) the allowance of maintenance or lack thereof; (8) dissipation of assets; (9) the tax consequences of the property division upon the respective economic circumstances of the parties; and (10) such other factors as the court considers necessary to make a just and reasonable division of property."

Contrary to Potts' argument, the parties' reliance on a premarital agreement for the division of property does not preclude the court from applying governing law, including applicable statutes, to divide property not addressed in the premarital agreement. See K.S.A. 2019 Supp. 23-2404(a)(3) (permitting use and application of premarital agreements to property division through divorce). While the premarital agreement terms governing property division will control the division of that property under the Uniform Premarital Agreement Act, any property not included in the premarital agreement must

19

still be divided by the court using the statutory factors of K.S.A. 2019 Supp. 23-2802(c). See K.S.A. 2019 Supp. 23-2401 et seq. (the Uniform Premarital Agreement Act).

The record is clear that the district court divided the parties' property according to the premarital agreement and the numerous postnuptial agreements where indicated, but then appropriately applied K.S.A. 2019 Supp. 23-2802(c) to that property not governed by the parties' agreements. In the district court's judgment order, it wrote that "[w]here neither the [premarital agreement] nor post-nuptial agreements are controlling, the Court has considered the statutory factors set forth in K.S.A. 23-2802, as discussed below, in determining the division of property." It is clear that when making its findings regarding Potts' required payment of $50,000 for each year of marriage, the court clearly applied the terms of the premarital agreement. This court finds no error in the district court's use and application of K.S.A. 2019 Supp. 23-2802(c) to the property not governed by the parties' other contractual agreements.

2. *The district court did not abuse its wide discretion in awarding Bowers $188,000 for Potts' purported contractual breaches.*

Potts also argues that the district court abused its discretion in interpreting several of the parties' postnuptial agreements to award Bowers dissipation compensation for her IB account and the balances due on the parties' 2015 Household Promissory Note and May 2016 Consolidated Note. Potts claims the court erred in awarding these amounts because Bowers failed to allege a breach of contract claim or prove that Potts breached an agreement to pay the consolidated loan amount.

*Preservation*

Once again, this court must determine if Potts preserved these contractual arguments for appeal because parties generally cannot raise issues on appeal that were

20

not raised before the district court. *Gannon*, 303 Kan. at 733; see also Rule 6.02(a)(5) (requiring pinpoint cites in the record to preserved claims). Bowers argues that Potts failed to preserve these dissipation and contract-breach errors, but Potts asserts that he preserved these issues because he raised this argument in his motion to alter or amend judgment filed on January 17, 2020. However, that motion is not included in the record on appeal and thus does not satisfy Potts' preservation requirement. Potts also cites a section of the district court's journal entry and decree of divorce that found Bowers "sustained a loss of $40,431" from Potts' dissipation of her IB account, and the last two pages of the district court's journal entry on motion to alter or amend judgment, alleging the court "granted [Bowers'] request to increase the Judgment amount owed on the promissory note from $14,867 to $23,313.73 and denied [Potts'] request to strike the damages award of $40,431." But the cited pages of the district court's journal entry do not include all the information in Potts' proposition.

However, the district court's journal entry does demonstrate that Potts made some of these arguments to the district court. First, the journal entry acknowledges that Potts argued in his motion to alter or amend judgment that the court should remove the $40,431 dissipation award relating to his failure to comply with the 30 percent bond requirement of the parties' IB account agreement. Second, the journal entry further acknowledges that Potts argued that the dissipation award should be removed because "Bowers did not include a claim for damages in the Pretrial Order based on the failure to maintain 30% of the investment in bond funds." But Potts does not limit his argument on appeal to the dissipation related to his failure to maintain a 30 percent bond investment mix. Instead, he argues that the district court erred by making *any* dissipation award because Bowers' IB account was not marital property. Additionally, the journal entry does not demonstrate that Potts objected to the district court's decision to award Bowers the balance on the parties' 2015 Household Promissory Note or May 2016 Consolidated Note because Bowers failed to allege breach of contract—the other claim Potts is now making on appeal.

21

Viewing the briefing and record generously, Potts has shown he preserved an argument that the $40,431 dissipation award was in error—and this court's review of that issue applies to the total dissipation amount. However, Potts has not shown that he preserved his argument that the district court's 2015 Household Promissory Note and May 2016 Consolidated Note awards were in error. Even if, however, this court were to accept Potts' assertion that he properly preserved these issues for appeal, they would nevertheless fail.

*Standard of Review*

On appeal, this court reviews the district court's division of property in a divorce action for an abuse of discretion. *In re Marriage of Wherrell*, 274 Kan. 984, 986, 58 P.3d 734 (2002). A district court abuses its discretion if (1) no reasonable person would take the view adopted by the court, (2) its decision is based on an error of law, or (3) its decision is based on an error of fact. See *Biglow v. Eidenberg*, 308 Kan. 873, 893, 424 P.3d 515 (2018). The party asserting the court abused its discretion—in this case Potts—bears the burden of demonstrating the abuse of discretion. *Gannon v. State*, 305 Kan. 850, 868, 390 P.3d 461 (2017). Because the district court has "'wide discretion'" in adjusting the financial obligations of the parties in a divorce action, exercise of that discretion should not be disturbed unless "'clear abuse of discretion'" is shown. See *In re Marriage of Rodriguez*, 266 Kan. 347, 352, 969 P.3d 880 (1998).

*The district court did not abuse its discretion by awarding Bowers $152,431 for Potts' dissipation of her IB account.*

The district court was required to divide the parties' real and personal property not governed by their premarital agreement pursuant to K.S.A. 2019 Supp. 23-2801 et seq. Additionally, the district court was to consider "dissipation of assets" when making this division. K.S.A. 2019 Supp. 23-2802(c)(8). But Potts argues that the district court abused

its discretion by awarding Bowers any dissipation amount because Bowers' IB account was Separate Property—not marital property—and thus not subject to dissipation pursuant to K.S.A. 2019 Supp. 23-2802(c).

The district court made explicit findings in its amended journal entry and decree of divorce that the IB account was titled as a "joint account," but Potts "considered it to be [Bowers'] own account" and Bowers was the only person to ever fund the account. Thus, the court determined that the IB account "should be viewed as [Bowers'] separate property, consistent with the intent of the parties." The court then analyzed each of Bowers' claims related to Potts' alleged dissipation of the IB account. The district court found Potts dissipated Bowers' IB account in three ways:

    (1) Potts failed to maintain 30 percent of Bowers' investments in bond funds as the parties' 2007 agreement required, resulting in a dissipation of $40,431;

    (2) Potts failed to close the account in a timely manner once Bowers requested he do so, resulting in a dissipation of $22,000; and

    (3) Potts failed to keep Bowers apprised of the account declines, resulting in a dissipation of $90,000.

Potts' central argument is that the IB account was not "marital" property and thus not subject to dissipation. Potts relies on *In re Marriage of Rodriguez*, 266 Kan. at 352, for this argument, where the court explained

> "we believe the legislative intent is clear in that it allows a trial judge wide latitude to divide marital property and this latitude provides the judge with discretion to consider whether marital assets were lost as a result of the wrongful conduct of one of the parties to the marriage."

In relying on this argument, Potts contends that "marital assets" or "marital property" does not include separately owned property. However, the definition of marital

23

property is not so narrow—it includes "[*a*]*ll property* owned by married persons . . . whether described in K.S.A. 23-2601 . . . or acquired by either spouse after marriage, *and whether held individually or by the spouses in some form of co-ownership . . . shall become marital property* at the time of commencement [of a divorce]." (Emphases added.) K.S.A. 2019 Supp. 23-2801(a). Thus, even assuming the IB account was Bowers' separately owned property—or even "Separate Property" as defined in the premarital agreement—it would still be considered "marital property" under K.S.A. 2019 Supp. 23-2801(a), which is not the same as joint property under the premarital agreement. The district court did not divide the IB account but rather considered Potts' dissipation of that account, which was not contrary to the premarital agreement or the numerous postnuptial agreements, and was consistent with the applicable statutes. Thus, in considering Potts' dissipation of the IB account in making its property division, the district court did not erroneously apply the law and, therefore, did not abuse its discretion. See K.S.A. 2019 Supp. 23-2802(a), (c)(8).

Additionally, this court finds no error in the district court's calculation of that amount. The district court found Potts caused $40,431 of dissipation by failing to maintain the parties' 30 percent bond investment clause—a term of the parties' 2007 IB Agreement. The district court found:

> "As discussed above, the initial investment agreement between the parties contained a 30% bond fund investment requirement. Ms. Bowers claims that Mr. Potts failed to adhere to this requirement, while Mr. Potts claims that he followed this requirement up to the time it was removed in the March 30, 2011 Agreement.
>
> "The IB account documentation for 2008 and 2009 does not appear to reflect any assets devoted to bond funds. If such investment had been maintained, it is doubtful that the initial investments, after accounting for authorized withdrawals, would have ever been reduced to near zero.
>
> "Following Ms. Bowers' initial deposits totaling approximately $80,000 into the account, $39,000 was removed in 2008 through authorized disbursements. Had 30% of

24

the remaining $41,000 balance (an amount totaling $12,300) been invested in bond funds, as required by the controlling December 10, 2007 Agreement, it is likely that at least $12,300 would have remained in the account, regardless of losses to 70% of the account through more speculative investing.

"On January 30, 2009, Ms. Bowers deposited $100,000 into the account, and later took a $5,000 disbursement on June 17, 2009. Had 30% of this $95,000 investment been maintained in bond funds, it is likely that at least $28,500 would have been preserved. However, losses from trading in more volatile stocks and futures reduced the account to $369 by the end of 2009.

"Because Mr. Potts failed to maintain 30% of these investments in bond funds, the Court concludes Ms. Bowers sustained a loss of $40,431 (based on $12,300 + $28,500, less the remaining fund balance of $369). The Court finds that this loss resulted from Mr. Potts' failure to adhere to the terms of the December 10, 2007 Agreement, and constitutes a dissipation of Ms. Bowers' assets."

The court also found Potts caused an additional $22,000 of dissipation to the account by failing to close the account when Bowers requested. The court noted:

"On January 3, 2015, Mr. Potts provided Ms. Bowers with information concerning the value of her assets, including IB Acct. #1882 worth $41,000. On January 8, 2015, Ms. Bowers asked that the account be closed and the funds wired to her bank account. Despite her request, the account was not closed for weeks, during which time the value more than doubled to $89,000 before dropping to $19,000 at which time the account was finally closed and the money was transferred to Ms. Bowers' bank account in February, 2015."

Finally, the court found that Potts caused $90,000 of dissipation by failing to inform Bowers of account declines. The court noted:

"Ms. Bowers claims that she was not kept apprised of the decline occurring to the account. After Mr. Potts sent her the January 3, 2015 email, advising that the account had declined to $41,000 a string of email communications from Ms. Bowers contains information consistent with her claim that she had not been kept apprised of these

25

declines. Mr. Potts testified that he was embarrassed that the account had fallen. In a January 11, 2015 email he sent to Ms. Bowers, he stated: 'I initiated a trading plan that is experiencing a large drawdown, and yes I avoided telling you in hopes that the reversal would turnaround sooner rather than later. . . .'

. . . .

"Ms. Bowers knew that the account had declined to $359,311 by June 13, 2013, and took no action at that time to halt trading and secure her profits. However, it is less clear after this point in time, how much information Ms. Bowers received from Mr. Potts regarding further account declines.

"The Court is convinced that Mr. Potts did not keep Ms. Bowers fully apprised as declines continued. Mr. Potts as much acknowledges this in his January 11, 2015 email to Ms. Bowers. Having known this money was intended for the future benefit of Ms. Bowers' disabled son, and was being invested in such volatile financial securities, Mr. Potts should have kept Ms. Bowers better apprised of the account status. For these same reasons, Ms. Bowers should have been more vigilant in keeping track of the account status.

"Had Ms. Bowers been kept better advised of the declines in the account, and either requested an earlier closing of the account, or despite such knowledge, took no action to limit further declines, all of these losses would have been the result of informed investment choices, and not the result of wrongful conduct. While it is difficult to determine whether Ms. Bowers would have acted sooner to limit further loss, the Court believes that by failing to keep her better informed, Mr. Potts deprived her of the opportunity to act upon relevant information."

With the available record, this court cannot say that no reasonable person would agree with the court's dissipation analysis and calculation. The district court has "'wide discretion'" in making its division of property under K.S.A. 2019 Supp. 23-2802, and Potts has failed to show how the district court abused that discretion by awarding Bowers

26

$152,431 for his dissipation of her IB account. See *In re Marriage of Rodriguez*, 266 Kan. at 352; see also *Gannon*, 305 Kan. at 868.

> *The district court did not abuse its discretion by awarding Bowers $23,314 and $12,255 for Potts' breach of their postnuptial agreements.*

Finally, Potts argues that the district court abused its discretion by awarding Bowers $23,314 for the unpaid balance on the parties' 2015 Household Promissory Note and $12,255 for the unpaid balance on the parties' May 2016 Consolidated Note, because Bowers "did not allege a breach of contract claim, or prove [that Potts] breached an agreement to pay the consolidated balance amount." As addressed above, Potts has not shown where he made this argument before the district court. Even if, however, this court were to accept Potts' argument that this claim is properly preserved for appellate review, it would nevertheless fail.

At trial, Potts acknowledged the existence of the 2015 Household Promissory Note and May 2016 Consolidated Note and failed to object or challenge Bowers' testimony that Potts had not paid the remaining balances on those postnuptial agreements.

Potts testified as follows:

"Q: All right. And exhibit—in the final agreement, Exhibit 52, she—you entered into the [July 2015] promissory note where she loaned you $20,000.
"A: That was to pay—that was for me to pay living expenses, if I'm not mistaken.
"Q: You mean so she was going to loan you money so that you could pay for her living expenses?
"A: Hers and mine, yes.
"Q: But you agreed to it, right? You signed it?
"A: I was trying to stay married.
        . . . .

27

"Q: All right. Turn to Exhibit 354. Exhibit 354 is another document that you both signed in May of 2016 . . . is that correct?

"A: Yes.

. . . .

"Q: . . . But at the very end of it, it looks like you and she—somebody wrote in some handwritten information and it says, 'Tim [*sic*] and Beth agree that the total note will be $12,255 after today's $4,000 deposit and that this deposit replaces a 12/27/15 promissory note.'

"A: Yes.

. . . .

"Q: And then you also wanted Beth . . . to send you $10,000 for the West Bay golf membership, correct?

"A: Yeah, I wrote, 'If you agree, you could send 10,000 to West Bay on Monday using FedEx two-day delivery, they would then receive it on December 30th.'"

Potts never testified that he completed his obligations under any of these postnuptial agreements, nor did he challenge Bowers' testimony that he had not completed his payments on the 2015 Household Promissory note or the May 2016 Consolidated Note. The district court heard the parties' arguments, saw exhibits evidencing the parties' postnuptial agreements at trial, and made explicit findings in its amended journal entry and decree of divorce that all the parties' postnuptial agreements were "fair, just, equitable and enforceable." It found that Potts signed the 2015 Household Promissory Note for the $20,000 loan but made no payments on it, such that the remaining balance with penalties and interest was $23,313.73. It also found Potts agreed to the May 2016 Consolidated Note for $12,255—combining the balances of the parties' December 2015 and April 2016 loans—but Bowers never received any payments on it.

It remains true, just with the prior decisions, that the district court has "'wide discretion'" in adjusting the financial obligations in a divorce proceeding. *In re Marriage of Rodriguez*, 266 Kan. at 352. And these findings should not be disturbed unless the objecting party can show a clear abuse of discretion. 266 Kan. at 352. To demonstrate an

28

abuse of discretion, Potts has the burden to show that the district court acted unreasonably or made an error of law or fact—he has not met that burden. See *Gannon*, 305 Kan. at 868.

CONCLUSION

After protracted litigation, the district court, being in the best position to analyze the evidence, issued a lengthy and thorough amended journal entry and decree of divorce including a $417,093 judgment against Potts. On appeal, Potts has failed to demonstrate any error of law or fact or that no reasonable person would concur with the district court's judgment. The district court is afforded great discretion, and this court cannot say that no reasonable person would have agreed with its well-reasoned analysis and ultimate judgment. Finding no abuse of the district court's wide discretion, this court affirms the judgment.

Affirmed.